[Cite as *State v. Remy*, 2018-Ohio-2857.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2017-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-42B |
| | : | |
| TAMARA L. REMY | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of July, 2018.

. . . . . . . . . . .

ANDREW P. PICKERING, Atty. Reg. No. 0068770, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

KIRIAKOS G. KORDALIS, Atty. Reg. No. 0089697, 130 West Second Street, Suite 1818, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} In this case, Defendant-Appellant, Tamara Remy ("Tamara"), appeals from her convictions and sentences on three counts of intimidation, three counts of domestic violence, three counts of endangering children, one count of complicity to rape, one count of rape, and three counts of gross sexual imposition. After a jury trial, Tamara was sentenced to a total of two consecutive life sentences, without the possibility of parole.

{¶ 2} As grounds for her appeal, Tamara contends that the trial court committed various errors, including allowing forensic interviews of her three minor children to be played during the trial, allowing one child to testify via closed circuit television, and finding that the minor children were competent to testify.

{¶ 3} Tamara further contends that she was denied effective assistance of counsel because her trial counsel failed to object to hearsay testimony, failed to object to the court's decision to let the minor child testify outside the courtroom, failed to object to improper expert testimony, and failed to object to admission of an audio recording of the children's abuse allegations. Finally, Tamara contends that her convictions for rape and complicity to rape were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 4} For the reasons discussed below, all of Tamara's assignments of error are without merit. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 5} According to the State's evidence at trial, the following facts were established:

{¶ 6} Tamara met Christopher Remy ("Chris") in November 2012, and he moved in with her the following month. They then married in March 2013 and resided in the top half of a duplex in Springfield, Ohio. Tamara had three daughters from a prior relationship: D.C. (born in February 2007), J.C. (born in August 2008), and K.C. (born in March 2010). The girls were six, four, and almost three years old, respectively, when Chris and Tamara married.

{¶ 7} Prior to Tamara's relationship with Chris, the girls' biological father, Ronald C. (also known as "Bub"), had been sentenced to prison. As a result, Tamara began to rely on Rebecca K. ("Becky") for help with the girls. At the time, Becky was the girlfriend of the girls' paternal grandfather. Becky, whom the girls called "Grandma Becky," babysat the children, often cared for them at her home over weekends, and took Tamara to doctors' appointments.

{¶ 8} After the marriage, the girls told Becky that Chris was mean to them, and that he picked on D.C. because she looked the most like Bub. A few months after the marriage, D.C. told Becky that Chris was smacking her and was touching her "privates." When Becky took the girls back to Tamara, she told Tamara about what D.C. had said. Tamara stood there, with no expression on her face. When Becky asked Tamara what she was going to do about it, Tamara said she would make a doctor's appointment to see if the girls had been touched, and they would go from there. Tamara told Becky to take the girls back to her house and bring them back the next day.

{¶ 9} After Becky brought the girls back, she did not talk to Tamara for two months because Tamara would not return any of her calls or texts. About two months later, Becky received a text from Tamara, which said, "Please don't take my kids from me." In

response, Becky told Tamara that she was not trying to take the children away; she was attempting to protect them and help Tamara. After that, Tamara allowed Becky to see the children again. When the girls came back, Becky asked them if they had been to the doctor, and they said no. Although Becky was confused by this, the girls were acting normally again, so she let it go. At trial, Tamara testified that she and Chris had separated from July 2013 to November 2013, which would have coincided with the general time frame of the above events. However, Tamara did not indicate why they had separated.

{¶ 10} The routine was that the girls would come to Becky's home every weekend. In 2015, Memorial Day was on Monday, May 25, and the girls were with Becky. They had to go back to school on Thursday. On Wednesday of that week, while Becky was giving the girls a bath, J.C. (who was then six years old), stated that D.C. had hit her in the nose and made her "butt bleed." When Becky explained that J.C.'s nose would bleed, not her butt, J.C. said, "Oh well[,] that must have been when Chris was picking in my butt." (Transcript of Proceedings ("Tr.") at p. 367.)

{¶ 11} With the girls' knowledge, Becky made a recording with a voice recorder on her phone (State's Ex. 1). Becky thought she needed to make a recording because she had already told Tamara about things the girls had said the year before, and nothing had been done. The girls were afraid and asked Becky not to tell Tamara or Chris. Becky told them not to tell their mother or Chris about the recording. She then let the girls go home because she was not sure what to do. At that point, Becky decided to get Bub's family involved since she was not biologically related to the girls.

{¶ 12} Becky testified that she contacted Kayleigh (Bub's sister) and Logan (Bub's

first cousin) about the girls' allegations. That Friday afternoon, May 29, Logan was at Becky's house because every Friday, like clockwork, Chris brought the girls over for the weekend after they got out of school. However, Chris did not show up that day. When Becky contacted Tamara to find out why, Chris answered the phone and said the girls could not come because all three of them had poison ivy, head to toe. Becky found this unlikely, since she had just seen the girls a few days earlier.

{¶ 13} Logan and Kayleigh both listened to the recordings on Friday, May 29, 2015, and decided to call the police. Logan contacted the police and reported that his three young cousins had possibly been sexually assaulted by their stepfather. At about 4:30 p.m. that day, Springfield Police Officer Roger Jenkins responded to Logan's report and met with Logan and Kayleigh at a vacant lot near Tamara's house. They played the recording for Jenkins, who then contacted his supervisor, Sergeant Doug Pergram. After consulting with Jenkins, Pergram called other officers, including Detective Sandra Fent of the Crimes Against Persons Unit, Juvenile Division. Shelby Lowe, a social worker at the Child Advocacy Center ("CAC") also came to Tamara's house on a "rapid response referral," because the call occurred after normal work hours. The CAC is part of the Clark County Department of Job and Family Services, but is also part of a multi-disciplinary team that attempts to reduce trauma to children who allege abuse or neglect.

{¶ 14} Detective Fent and Officer Jenkins approached the Remy residence, where they encountered Chris and D.C.; J.C. and K.C. were with family members at Wal-Mart, where Tamara worked. Detective Fent and Lowe decided to interview the girls immediately at the CAC, and Fent drove D.C. to the CAC. After Tamara and the other two girls returned home, she and her grandfather, Jerry M., were asked to drive the two

girls to the CAC.

{¶ 15} Lowe, the CAC social worker, conducted separate forensic interviews of D.C., J.C., and K.C., all of which were video-recorded; Detective Fent watched a live-feed of the interviews from an observation room. While K.C. was waiting and playing in the CAC lobby, she approached Sergeant Pergram and spontaneously said, "Chris puts his pee hole in my mouth." Tr. at p. 435. After hearing this, Pergram informed Detective Fent of K.C.'s statement.

{¶ 16} After finishing the interviews of each child, Lowe and Detective Fent decided that the girls could not be safely returned to their home. They consulted Tamara about where the girls could be placed, and Tamara immediately said she did not want the girls to go with Becky. The girls were then placed with their paternal grandmother and her husband, and Tamara agreed to that plan.[1]

{¶ 17} During her interview with Lowe, K.C. had disclosed the occurrence of sexual abuse within the past 72 hours, so Lowe referred K.C. to Dayton Children's Hospital for a medical examination. That night (May 29, 2015), the grandparents took K.C. to Dayton Children's, where an emergency department social worker, Belinda Dewberry, interviewed K.C. Dr. Vipul Garg also examined K.C. Dewberry learned from the grandmother that Chris had allegedly "put his weiner" in K.C.'s mouth and that Chris had hit K.C.'s head and slammed her on the bed. This information was placed in K.C.'s medical records. In addition, K.C. told Dr. Garg that Chris put his "weiner in her mouth"

---

[1] For convenience and clarity, the paternal grandparents will be called the "grandparents," grandmother or grandfather, or "Mammaw" and "Pappaw" from now on, as necessary, because the girls' biological paternal grandfather was not involved in the case.

while her mother was at work.   State's Ex. 2A, p. 4; Tr. at p. 537.

{¶ 18} Lowe re-interviewed the girls on Monday, June 2, 2015.   Tamara was present at the CAC and was observed whispering to the girls.   When each girl went in for an interview, Tamara sat with the others and whispered things to them.   While these interviews were also video-recorded, the recordings were lost due to a system failure.   Lowe testified that, during the interviews, which were very short, the girls appeared to be shy, did not make eye contact, looked down, and did not want to talk.   Shortly thereafter, Lowe learned that Tamara had told the girls to act scared and shy during the interviews.

{¶ 19} After the girls were removed from Tamara's home, they all displayed disruptive and/or sexualized behaviors.   The grandparents described, for example, lying, stealing of jewelry (all girls), unlocking of doors and turning off outside lights at night, masturbation (J.C.), defiance (J.C. and sometimes K.C.), and urination on the rugs and furniture (mostly J.C., but sometimes K.C.).   In August 2015, the girls told Lowe that Tamara had told them at visitation to be "bad" at the grandparents' house; the grandmother testified that many of these behaviors improved when visitation stopped.   In addition, J.C. displayed sexual behavior around males and mimicked oral sex when eating bananas and using straws.   J.C. and K.C. put their fingers in the rectum of one of the family's dogs.   D.C. would not wipe after bowel movements and displayed a lack of self-awareness regarding her body.   K.C. once smeared feces on the wall and on D.C.'s possessions.   Around the end of July 2015, the grandmother also learned that J.C. was sexually assaulting her sisters.

{¶ 20} Originally, Tamara was given visitation with the girls for two hours on two days each week, at a visitation center.   The first visit occurred on June 29, 2015.   At

Detective Fent's request, visitation was suspended on July 24, 2015. Fent's request was based on comments and threats Tamara allegedly was making during visitation, and on behaviors the girls demonstrated after visits. Very troubling behavior and events took place during the time period that visitations were occurring, including torture (not by the girls) of dogs that stayed outside in their grandparents' yard (eventually resulting in the death of one of the dogs), threats to the girls by Tamara, and requests by Tamara for the girls to misbehave and steal their grandmother's jewelry.[2] Visitation was resumed on September 8, 2015, during which Tamara was required to be supervised at all times.

{¶ 21} D.C. and K.C. have remained with the grandparents since their removal from Tamara's home. D.C. and K.C. also received therapy at Rocking Horse Center with different counselors. In early September 2015, J.C. was removed from the grandparents' home due to her problematic behavior, and she was placed in foster care. J.C. had behavioral issues at her first foster placement, and in October 2015, she was placed with a couple who were house parents at Oesterlen Respite and Resource Center, a short-term foster care facility. The house parents subsequently received temporary custody of J.C. After the change in foster placement, J.C.'s behavior significantly improved. J.C. received counseling from Rocking Horse Center and, after her placement in foster care, from Youth Challenges, which is a partial hospitalization facility.

{¶ 22} Lowe interviewed the girls on two other occasions: (1) on August 25, 2015,

---

[2] For example, D.C. told a therapist that Tamara had said Chris had a knife and was going to kill Mammaw's dogs. Tr. at p. 1294. K.C. also told her therapist that Tamara said, "I'm going to stab and kill you because you are talking bad about Chris," and that "I'm going to kill you and stay married to Chris." Tr. at p. 1297. In addition, J.C. testified at trial that her mother told her to steal jewelry from her grandmother and hurt the dogs at her grandparents' house. Tr. at p. 1415. There was testimony from a number of therapists and the children about these threats and others that were made by Tamara.

after the agency received a "family in need of services" referral; and (2) on October 28, 2015 (J.C.) and November 4, 2015 (D.C. and K.C.), after the agency received new allegations of sexual abuse. Dr. Lori Vavul-Roediger, a board-certified child abuse pediatrician at Dayton Children's Hospital, examined J.C. on October 12, 2015. Dr. Vavul-Roediger also examined K.C. and D.C. on October 15, 2015.

{¶ 23} Beginning in the late summer/early fall of 2015, the girls began disclosing sexual abuse by Tamara, including: that she watched while Chris abused them and said she did not care if he did it; that she asked Chris to hurt her the way he did them; that she prevented D.C. from calling 911 for help and then punished D.C.; that she hurt the girls the same way that Chris did; that she had touched their private parts; that Tamara and Chris were hurting them; and that Tamara had sexually abused the girls' cousins. The girls also disclosed that Tamara had physically abused them, that she saw what Chris was doing and did not care, and that they were threatened with physical abuse if they told anyone what was going on.

{¶ 24} Lowe, the CAC social worker who conducted the forensic interviews of the girls, tried to contact Tamara about the allegations. An interview was scheduled with the police department, but Tamara was a no-show, no call. Lowe also called Tamara but Tamara did not call her back. Ultimately, on November 19, 2015, the juvenile court judge suspended Tamara's visitation for all three girls, based on a motion filed by a guardian ad litem. Detective Fent subsequently spoke with Tamara in December 2015, and Tamara denied the allegations.

{¶ 25} In February 2016, a 42-count indictment was filed against Chris and Tamara. Chris was indicted on 27 charges, which included rape, attempted rape, gross

sexual imposition, intimidation, domestic violence, and endangering children. Tamara was indicted on 15 charges, which included one count of rape, two counts of complicity to rape, three counts of intimidation, three counts of domestic violence, three counts of endangerment of children, and three counts of gross sexual imposition.

{¶ 26} On November 14, 2016, the trial court held individual in-camera interviews with D.C., J.C., and K.C., and concluded that each child was competent to testify at trial. The court then held a joint trial of the charges against Chris and Tamara.

{¶ 27} During the jury trial, which began on November 16, 2016, the State presented the following witnesses: Logan; Kayleigh; Becky; the responding police officers, including Detective Fent; Lowe; all of the children's counselors at Rocking Horse Center; J.C.'s counselor at Youth Challenges; the physicians who examined the children; a social worker from Dayton Children's Hospital; Tamara's ongoing case-worker; two employees of the visitation center; the grandparents; J.C.'s current foster parents, the children (D.C., J.C., and K.C.); and Dr. James Duffee, an expert in pediatric medicine and pediatric psychology. At the end of the State's case, the State voluntarily dismissed one charge against Chris (Count 33, attempted rape), and one of the complicity to rape charges against Tamara (Count 23).

{¶ 28} Tamara presented her defense following the State's case. She testified on her own behalf, denying all the allegations. Tamara also offered the testimony of her grandfather and his teenage daughter, who lived in the bottom half of the duplex where Chris and Tamara had lived, and Tamara's sister. All these witnesses testified that they never saw or heard any indication of sexual or physical abuse of the children. Finally, Chris testified on his own behalf and denied all the allegations.

{¶ 29} The jury found Tamara guilty of all the remaining charged offenses, including three counts of intimidation, three counts of domestic violence, three counts of endangering children, one count of complicity to rape, one count of rape, and three counts of gross sexual imposition. After a presentence investigation was conducted, the trial court sentenced Tamara to the following terms of imprisonment: life sentences without the possibility of parole for rape and complicity to rape (Counts 24 and 39); 48 months for gross sexual imposition (Counts 25, 26, and 27); 30 months for intimidation (Counts 12, 28, and 40); 180 days for domestic violence (Counts 13, 29, and 41); and 36 months for endangering children (Counts 14, 30, and 42). The sentences for Counts 24 and 39 were to be served consecutively to each other, and the sentences for the remaining counts were to be served concurrently with each other and with the sentences for Counts 24 and 39. This resulted in a total of two consecutive life sentences without the possibility of parole.[3]

{¶ 30} Tamara now appeals and raises five assignments of error.

II. Alleged Error Concerning Forensic Interviews

{¶ 31} Tamara's First Assignment of Error states that:

The Trial Court Erred in Allowing Forensic Interviews of the Minor

Children to be Played During the Trial.

{¶ 32} Under this assignment of error, Tamara contends that the children's forensic interviews on May 29, 2015, October 28, 2015, and November 4, 2015, should not have

---

[3] Chris was found guilty of all his remaining offenses, except one count of gross sexual imposition, and received an aggregate sentence of three consecutive mandatory terms of life in prison without the possibility of parole.

been admitted into evidence because they were not conducted for purposes of medical diagnosis or treatment, were testimonial, and were designed to prove past events that would be relevant to Tamara's criminal prosecution. In making this argument, Tamara contends that the statements were testimonial for purposes of the Confrontation Clause.

{¶ 33} The State responds that no violation of the Confrontation Clause occurred because the girls testified at trial. In addition, the State points out that because Tamara did not object at trial, her argument can be reviewed only under the plain error doctrine. And finally, the State argues that the video recordings were admissible under Evid.R. 803(4) because they involved statements made for the purpose of medical diagnosis and treatment.

{¶ 34} As an initial matter, we agree that Tamara did not object to the admission of this evidence at trial. Consequently, Tamara's contentions will be reviewed for plain error. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 176 (stating that like other constitutional rights, Confrontation Clause rights can be waived). *See also State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 191, and *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 83 (2d Dist.) (plain error review applies where Confrontation Clause arguments are not preserved by objection).

{¶ 35} Error is plain only where obvious, and where absent the error, the trial outcome would clearly have been otherwise. *Neyland* at ¶ 177. "Notice of plain error 'is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Id.*, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 36} Under the Sixth Amendment, accused parties in both state and federal prosecutions have the right to be confronted with the witnesses against them. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 12. As was noted, the State contends that no Confrontation Clause violation existed in the case before us, because the children testified at trial.

{¶ 37} In *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), the United States Supreme Court noted that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Id.* at 1016. Two types of protections are provided to a criminal defendant by the Confrontation Clause: " 'the right physically to face those who testify against him, and the right to conduct cross-examination.' " *Id.* at 1017, quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987).

{¶ 38} In *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the United States Supreme Court conceded that while "hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law." *Id.* at 155. In this regard, the court commented that:

> Our decisions have never established such a congruence; indeed, we have
> more than once found a violation of confrontation values even though the
> statements in issue were admitted under an arguably recognized hearsay
> exception. * * * The converse is equally true: merely because evidence is

admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied.

(Footnote omitted.)    *Id.* at 155–56.

**{¶ 39}** *Green* involved a witness's prior inconsistent statements to police and at a preliminary hearing; these statements were used at trial to refresh the witness's recollection and were admitted for their truth and as substantive evidence.    *Id.* at 151-152.    Based on recent decisions of the United States Supreme Court, the California Supreme Court concluded that the hearsay exception the legislature had adopted (which allowed use of prior inconsistent statements as substantive evidence) was unconstitutional.    In that court's view, this violated the Confrontation Clause, and the right to cross-examine the witness at trial was not an adequate substitute.    *Id.* at 153.    The United States Supreme Court disagreed.    *Id.*

**{¶ 40}** After making the above statements about the distinction between hearsay rules and the Confrontation Clause, the court reviewed the history of the Confrontation Clause, and stated that "[v]iewed historically, then, there is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination."    *Id.* at 158.    The court also stressed that none of its decisions interpreting the Confrontation Clause had required exclusion of "out-of-court statements of a witness who is available and testifying at trial."    *Id.* at 161.    Instead, most of the court's cases had been "focused on precisely the opposite situation—situations where statements have been admitted in the absence of the declarant and without any chance to cross-examine him at trial."    *Id.*    These situations had been subjected to

careful scrutiny because they dispensed "altogether with the literal right to 'confrontation' and cross-examination * * *." *Id.* at 162.

{¶ 41} Accordingly, the United States Supreme Court found nothing in either its decisions or in "the history or purposes of the Confrontation Clause" to require exclusion of prior statements of a witness who was testifying at trial. *Id.* at 164. The Ohio Supreme Court has also so held. *See, e.g., State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 66 (regarding admission of prior inconsistent statement, the Sixth Amendment only requires that a witness be "present in open court and confronted about his prior statement by all concerned: the state, the court, and defense counsel"); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64 ("admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial"). *See also State v. Isa*, 2d Dist. Champaign No. 07-CA-37, 2008-Ohio-5906, ¶ 16 ("Confrontation Clause does not bar admission of out-of-court statements where the defendant has the benefit of full and effective cross-examination of the declarant at the trial").[4]

---

[4] We note that there is some apparent inconsistency in this area. *See State v. Beasley*, 2018-Ohio-493, ___ N.E.3d ___ (Ohio). In *Beasley*, a victim testified at trial, and testimony from third parties, including a police officer, about the victim's statements was admitted under the hearsay exception for "excited utterances." *Id.* at ¶ 1, 23, 43, 176, and 179. The Supreme Court of Ohio stated that while these statements were admissible under the hearsay rules, they "must also be evaluated under the Confrontation Clause. The Confrontation Clause applies only to 'testimonial statements.' " *Id.* at ¶ 181, citing *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59. In *Muttart,* after deciding that a child's statements were made for the purpose of diagnosis, the court went on to address the defendant's contention that his Sixth Amendment rights to confrontation had been violated under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that if statements proffered are testimonial in nature, they must be subjected to cross-examination regardless of their reliability. *Muttart* at ¶ 58, citing *Crawford* at 68. The court concluded that the child's statements were not testimonial because they were "not made in the context of in-court testimony or

{¶ 42} The fact that the Confrontation Clause is not implicated in this case does not necessarily mean that the video recordings were properly admitted. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Under this definition, the statements in the video recordings were clearly hearsay. As a general rule, hearsay is not admissible. Evid.R. 802.

{¶ 43} In *State v. Self*, 56 Ohio St.3d 73, 564 N.E.2d 446 (1990), the Supreme Court of Ohio addressed whether the trial court properly admitted testimony from a child's psychotherapist and a case worker about statements a child had made about the defendant's sexual abuse. The court concluded that these statements were inadmissible as hearsay since the child testified, but found the error harmless in view of the overwhelming evidence of guilt. *Id.* at 81-82. However, the court declined to express an opinion about whether the statements could have been admitted under the medical diagnosis and hearsay treatment exception to the hearsay rule in Evid.R. 803(4), if the child had been unavailable. *Id.* at 82, fn. 8.

{¶ 44} Evid.R. 803 provides that certain statements are not excluded under the

---

its equivalent," and there was "no suggestion that they were elicited as part of the police investigation or in a sworn statement with intention of preserving the statement for trial or that they were a pretext or façade for state action." *Id.* at ¶ 61. To the contrary, the child's initial statements to her mother and two witnesses were deemed "excited utterances," and her statements to medical providers and therapists were not fostered by the State; instead, they were based on concern for the child's well-being and referrals for medical and therapeutic treatment. *Id.* at ¶ 61-62. The court, therefore, held that the child's statements were properly admitted under Evid.R. 803(4) and were proper under *Crawford. Id.* at ¶ 64. Notably, however, the child in *Muttart* was only four and a half years old, was not evaluated for competency, and did not testify, so she would not have been "available" as a witness.

hearsay rule, "even through the declarant is available as a witness." As relevant here, Evid.R. 803(4) provides an exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 45} In *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, the Supreme Court of Ohio held that "[r]egardless of whether a child less than ten years old has been determined to be competent to testify pursuant to Evid.R. 601, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment." *Id.* at syllabus. According to the court, deciding the purpose of a child's statements requires a factual inquiry. *Id.* at ¶ 49. To aid in this inquiry, the court suggested a "nonexhaustive list of considerations," including:

> (1) whether the child was questioned in a leading or suggestive manner, * * * (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a "bitter custody battle," * * * and (3) whether the child understood the need to tell the physician the truth * * *. In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations. * * * In addition, the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse.

(Footnote omitted.) *Muttart* at ¶ 49, quoting *State v. Dever*, 64 Ohio St.3d 401, 410, 596 N.E.2d 436 (1992).

{¶ 46} After considering these factors, the Supreme Court of Ohio concluded that the child's statements to medical and psychological caregivers were made for the purpose of medical diagnosis and treatment and were, therefore, sufficiently reliable to be admitted through the testimony of these providers. *Id.* at ¶ 56.

{¶ 47} The court went on to address the defendant's contention that his Sixth Amendment rights to confrontation had been violated under *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, which held that if statements are testimonial in nature, they must be subjected to cross-examination regardless of their reliability. *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, at ¶ 58, citing *Crawford* at 68. The court concluded that the child's statements were not testimonial because they were "not made in the context of in-court testimony or its equivalent," and there was "no suggestion that they were elicited as part of the police investigation or in a sworn statement with intention of preserving the statement for trial or that they were a pretext or façade for state action." *Id.* at ¶ 61. To the contrary, the child's initial statements to her mother and two witnesses were deemed "excited utterances," and the statements to medical providers and therapists were not fostered by the state; instead, they were based on concern for the child's well-being and referrals for medical and therapeutic treatment. *Id.* at ¶ 61-62. The court, therefore, held that the child's statements were properly admitted under Evid.R. 803(4) and were proper under *Crawford*. *Id.* at ¶ 64. As noted previously, the child in *Muttart* did not testify at trial, and the court's comments about the Confrontation Clause are not relevant.

**{¶ 48}** Subsequently, in *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, the Supreme Court of Ohio specifically discussed forensic interviews conducted of sexual abuse victims at child advocacy centers. The court concluded that the social worker who interviewed a child was acting as an agent of the police while conducting interviews, and that under the "primary purpose" test, the interview's primary purpose was to further the state's investigation, not to meet an ongoing emergency. *Id.* at ¶ 35-36. As a result, some of the child's statements about the alleged crime, like descriptions of the defendant's penis and the fact that the defendant had shut and locked the bedroom door before raping her, were testimonial in nature and their admission without prior ability for cross-examination violated the Confrontation Clause. *Id.* at ¶ 34.

**{¶ 49}** However, the court also held that other statements elicited during the forensic examination, like the sexual acts the defendant performed, were non-testimonial and were admissible because they were necessary for medical diagnosis and treatment. *Id.* at ¶ 37-38 and 41. Again, as in *Muttart*, the child was not available to testify at trial. *Id.* at ¶ 130 (O'Donnell, J., dissenting).

**{¶ 50}** In *Ohio v. Clark*, ___ U.S. ___, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015), the United States Supreme Court evaluated whether out-of-court statements of a child abuse victim had been properly admitted at trial. The child had been questioned by a preschool teacher, who had a mandatory duty under Ohio law to report suspected child abuse. *Id.* at 2178-2179. The trial court concluded that the child was not competent to testify, but also found the statements sufficiently reliable under Evid.R. 807 to be admitted as evidence. *Id.* at 2178.[5]

---

[5] This is probably the evidence rule that should have been applied in *Muttart*. Since the

{¶ 51} Under Evid.R. 807, statements of sexual abuse victims under the age of 12 are not excluded as hearsay "where the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804."

{¶ 52} When the case came before the Supreme Court of Ohio, the court held that the evidence should have been excluded because "the primary purpose of the teachers' questioning 'was not to deal with an existing emergency but rather to gather evidence potentially relevant to a subsequent criminal prosecution.' " *Clark* at 2178, quoting *State v. Clark*, 137 Ohio St.3d 346, 2013-Ohio-4731, 999 N.E.2d 592, ¶ 16. However, the United States Supreme Court reversed this decision. Initially, the court noted *Crawford's* holding that the Sixth Amendment "prohibits the introduction of testimonial statements by a *nontestifying* witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (Emphasis added.) *Id.* at 2179, quoting *Crawford*, 541 U.S. at 54, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 53} The court then said that while *Crawford* had not exhaustively defined the term "testimonial," other cases had added to the definition, and had used what came to be called the " 'primary purpose' " test. Under this test, " '[s]tatements are nontestimonial

---

child was not available as a witness, an analysis of Confrontation Clause requirements would have been appropriate even if the evidence were found sufficiently reliable for purposes of Evid.R. 807. As was noted, *Muttart* relied on *Crawford*. See *Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, at ¶ 58. However, in *Crawford*, the United States Supreme Court was dealing with the admission of the tape-recorded statement of a wife who did not testify at trial due to the state's marital privilege. *Crawford*, 541 U.S. at 40, 124 S.Ct. 1354, 158 L.Ed.2d 177. Consequently, the defendant in *Crawford* had no ability to cross-examine the witness about her out-of-court statement.

when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' " *Clark*, ___ U.S. ___, 135 S.Ct. at 2179, 192 L.Ed.2d 306, quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

**{¶ 54}** The court further noted that the additional factor of " 'the informality of the situation and the interrogation' " and that " 'standard rules of hearsay, designed to identify some statements as reliable, will be relevant.' " *Clark* at 2080, quoting *Michigan v. Bryant*, 562 U.S. 344, 358-358, and 377, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to creat[e] an out-of-court substitute for trial testimony.' " *Id.*, quoting *Bryant* at 358. This is consistent with the approach followed by the Supreme Court of Ohio in *Arnold*, when it considered the role of forensic interviews conducted by child advocacy centers. *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 9. Again, however, the child in *Arnold* was not available to testify and the issue here is not a Confrontation Clause violation; it is whether the girls' out of court statements during the interviews were properly admitted as an exception to Evid.R. 803(4). However, the above cases are helpful in evaluating this issue.

**{¶ 55}** In view of the above guidance, we conclude that the "primary purpose" of the forensic interviews at the CAC was for forensic information-gathering, not for medical diagnosis and treatment. As was noted, in deciding if statements to forensic interviewers

at child advocacy centers are intended for the purpose of medical diagnosis and treatment, instead of forensic investigative purposes, courts must identify the "primary purpose" of the statements. *Arnold* at ¶ 28.

{¶ 56} The Supreme Court of Ohio recognized in *Arnold* that " ' "[t]he purpose of a Children's Advocacy Center is to provide a comprehensive, culturally competent, multidisciplinary response to allegations of child abuse in a dedicated, child friendly setting." ' " *Arnold* at ¶ 29, quoting Chandler, *Children's Advocacy Centers: Making a Difference One Child at a Time*, 28 Hamline J.Pub.L. and Policy 315 (2006), which, in turn, quotes National Children's Alliance, Accreditation Guidelines for Children's Advocacy Centers 5 (2004).

{¶ 57} After the State presented the testimony of the police officers who initially responded to Logan's 911 call (Jenkins and Pergram), the State called Shelby Lowe of the CAC. Lowe also responded to Tamara's residence and then conducted the initial forensic interviews of the girls on May 29, 2015. Lowe conducted additional forensic interviews of the girls on June 2, 2015 (where there was no available recording), August 28, 2015 (all three girls), October 28, 2015 (J.C.), and November 4, 2015 (D.C. and K.C.). All available video-recordings were played for the jury

{¶ 58} According to Lowe, CAC "is a place where we do forensic interviews" in a "safe, * * * supportive, family-friendly" environment. Tr. at p. 451. CAC falls under the umbrella of the Clark County Department of Job and Family Services, and Lowe described it as a multi-disciplinary team that included forensic interviewers, law enforcement, mental health services, Dayton Children's Hospital, the prosecutor's office, victim witness services, the juvenile court, and the department of developmental

disabilities. She stated that CAC's purpose is "to reduce trauma to any child that alleges child abuse and/or neglect. We see different, more severe cases out of the Child Advocacy Center." Tr. at p. 452.

**{¶ 59}** Lowe stated that when cases are assigned to CAC, "we will coordinate with law enforcement and then set up a forensic interview." Tr. at p. 453. Interviews are videotaped so other team members or law enforcement can observe or later review videotapes; this is designed to prevent children from being subjected to multiple interviews. According to Lowe, forensic interviews are "fact-finding, nonleading, nonsuggestive" interviews, where the "primary goal is to interview a small child and find out what happened * * * in their [sic] words." Tr. at p. 454.

**{¶ 60}** If law enforcement is involved, Lowe coordinates with detectives to schedule forensic interviews. Tr. at p. 459. Where, as in this case, a child is under the age of 13, Lowe interviews the child alone, and a detective sits in an observation room to watch and listen. Tr. at p. 460. Lowe testified that, during interviews, "typically once we get to a certain point – * * * I will step out of the room, the child will stay in the room, and I will go talk to the detective in the observation room to see if they have any questions or comments for that child." Tr. at p. 461. If a child is older than the age of 13, a detective will sit in on the interview. Tr. at p. 460.

**{¶ 61}** Lowe further testified that part of the forensic interview is "to assess if that child needs a medical or mental health referral." Tr. at p. 467. Depending on the disclosure, the child may be referred to Dayton Children's Hospital. In addition, CAC refers children to counseling and to other agencies to assist them in dealing with traumatic events they have experienced. Tr. at p. 468. According to Lowe, the "primary goal" is

to assess a child's safety.   Tr. at p. 469.

{¶ 62} Consistent with CAC's general practice, Lowe interviewed D.C., J.C., and K.C. separately, while Detective Fent watched in the observation room.   At some point during each interview, Lowe left the interview room to consult with Detective Fent.   Lowe then asked additional questions when she returned.   During K.C.'s forensic interview on May 29, 2015, K.C. disclosed that Chris had put his penis in her mouth earlier that day. Due to the timing of the abuse disclosure, Lowe referred K.C. to Dayton Children's Hospital for an examination.   Tr. at p. 570.   She also referred all three girls for counseling.   *Id.*   In addition, Lowe and Detective Fent discussed a safety plan for the girls, and the girls were placed with the grandparents.

{¶ 63} Detective Fent and Lowe decided that Lowe should re-interview the children on June 2 (the Monday following Friday, May 29, 2015).   Fent was not present for these interviews, which were very short; the recordings of the interviews were lost and were not played for the jury.   Subsequently, Lowe received a family-in-need-of-service referral on August 25, 2015.   Lowe then contacted law enforcement as well as the grandparents, and scheduled additional interviews with the girls.   These interviews followed a format similar to the May interviews.   Tr. at p. 597.   This time, Detective Fent and the family's ongoing case worker, Kelly Pelyhes, observed the interviews from another room, and Lowe stepped out to consult with them during each interview.   The same format was used during Lowe's interview with D.C. on October 28, 2015, and in her interviews with D.C. and K.C. on November 4, 2015.

{¶ 64} According to the evidence, the primary purpose of Lowe's forensic interviews with D.C., J.C., and K.C. was for forensic information-gathering, not for the

purpose of medical diagnosis and treatment. The interviews were coordinated with law enforcement personnel, Detective Fent observed the interviews from an observation room, and Lowe consulted with Detective Fent before completing the interviews that the detective attended. The interviews were not conducted in a medical facility or through referrals from a medical facility, and there is no indication that the children gave the statements for purposes of obtaining a medical diagnosis or treatment. Although referrals to physicians and counselors were made following certain interviews, the primary goals, as stated, involved information-gathering, not to provide immediate medical (physical or mental health) care and diagnosis. This does not necessarily mean all the statements should have been excluded; as in *Arnold*, some statements may have been made for purpose of treatment. *Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 34 and 37-38.

{¶ 65} However, even if the recorded videos of Lowe's interviews (or at least the parts that were unrelated to medical treatment) were objectionable, we nevertheless conclude, upon review of the entire record, that their admission was harmless. Notably, Tamara has not challenged the admission of statements the girls made to Dr. Garg, Dr. Vavul-Roediger, Belinda Dewberry (an emergency room social worker), the therapists at Rocking Horse Center, and J.C.'s therapist at Youth Challenges.

{¶ 66} The allegations the girls made during the challenged interviews with Lowe were repeated to other medical professionals and/or therapists. As a result, the content of the statements would have been before the jury even without admission of the video-taped interviews. Furthermore, even if the video-recordings had not been admitted, Lowe would have been allowed to testify about the girls' demeanor during the interviews

and to referrals that were made as a result of their statements. Arguably, Lowe may also have been permitted to testify about some of the girls' allegations to explain why referrals were made, but not for the truth of the allegations themselves.

**{¶ 67}** Furthermore, counsel's failure to object to admission of the recorded interviews appears to have been part of a reasonable trial strategy. During opening statement, both defense counsel stressed that the case hinged on the girls' credibility and focused on contradictions in the girls' statements. For example, Chris's attorney said during opening statement that:

> And when you think about this whole case, after you've listened to everything, it all boils down to the statements of three children and whether or not the people that listen to them believe them; and I submit to you that even though those other people that are gonna [sic] come and testify might believe the children or have opinions about what the children do, you're allowed, as jurors, to make your own separate judgment and opinion on whether or not those children are credible, because that's what the whole story boils down to, three children coming forward.
>
> * * * We want you to bring all the tests that you use in your everyday life to determine someone's credibility, things like the consistency of someone's story, the consistency of that story with somebody else, whether or not that story is consistent with physical evidence or, in this case, no physical evidence; but even having the same wording, I can talk about consistencies and inconsistencies; but even having the same wording can be enough to raise suspicion. * * *

Then you also have to consider the sources of the situation. In this case you will have family members that come in and say these girls are habitual liars, liars, manipulative. Take that into consideration when determining whether you believe their story, whether or not they're credible. You also have to consider whether or not their story makes sense and whether or not the suspicious timing of when these stories come out.

\* \* \*

\* \* \* Lies are lies, whether or not they're big, small, or in some cases as referred to in this case, play lying. It's still a lie. They're still liars.

Ms. McCormick's [State's counsel's] right. This is a case of the ultimate betrayal, but it isn't who you think it is. It's a betrayal of grandparents against grandparents and children against parents and stepparents.

Tr. at pp. 53-55.

{¶ 68} Tamara's counsel followed the same theme, stating that:

This case is about false allegations of Tamara Remy and Christopher. I submit to you that after you hear all the evidence, you're gonna [sic] conclude that it all comes down to one thing: What did the three children have to say? You're gonna [sic] see this long list of witnesses that every one of these witnesses is gonna [sic] be basing everything they say on one thing, what did the three children say? And I would submit to you that you're also going to hear evidence that the children's testimony has been tainted, what they've told the service providers, law enforcement,

medical personnel, it's been tainted.

You will hear from several categories of individuals, the first is, like, the individual family members that the children talked to initially. These family members, some of them had the motivation to go after Christopher and Tamara Remy. They don't like Christopher Remy, for instance. They don't care for Tamara Remy. They have reasons that they would like to get back at them.

They're unqual – they performed essentially what amounts to an interview with these children at the very beginning when this case first started. These people have no training in how to interview a child. They have no idea whether they're going to be putting false memories in these children's minds, whether they're going to be getting responses from the children just to please the adults. They don't have any idea what forms the questions are gonna [sic] take. Are they asking the children questions and discussing with them in ways that suggest the answer? So at the end we have the first responders; and by that, I'm referring to the law enforcement officers and the social workers that just show up. There are certain things they're supposed to do in order to maintain the credibility of what any of these children say. I would submit that the evidence is gonna [sic] show that none of that was followed.

Tr. at pp. 57-58.

{¶ 69} Establishing the validity of these assertions would have been impossible without showing the recorded interviews to the jury. The same theories were reiterated

during closing argument, during which counsel for Chris stated that the girls' "credibility is what's most important." Tr. at p. 1937. He noted that the State's expert, Dr. Duffee, stressed the importance of careful interviewing, and that much of the abuse information came from the girls and their grandparents. Tr. at pp. 1938-1939. Defense counsel further stressed that the girls' statements were inconsistent, and argued that "[t]here was a plan" by the girls' father's family (Logan, Kayleigh, Becky, and others) to get the girls away from Tamara and with their father's family, and "the plan wasn't spoiled just because Becky doesn't see the kids." Tr. at pp. 1940-1941.

{¶ 70} Chris's counsel also focused on the fact that the girls' demeanor changed during every interview as a basis for disbelieving their stories. Tr. at pp. 1941-1943. Again, making this comparison would been impossible without the jury's ability to view the recordings.

{¶ 71} During his closing statement, Tamara's counsel incorporated the arguments made by Chris's counsel. Tr. at p. 1948. He also emphasized suggestiveness and contamination during the interviews, and in how they were conducted. Tr. at pp. 1949-1951 and 1953-1954. The interviews were critical to proving these theories.

{¶ 72} Based on the preceding discussion, we cannot conclude that the trial outcome would have been otherwise, absent the alleged error, or that a miscarriage of justice occurred. *See Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 176-177. Accordingly, the First Assignment of Error is overruled.

### III. Alleged Error in Closed-Circuit Testimony

{¶ 73} Tamara's Second Assignment of Error states that:

The Trial Court Erred in Allowing Minor Child [J.C.] to Testify Via Closed Circuit Television.

**{¶ 74}** Under this assignment of error, Tamara contends that the trial court erred in granting the State's request to have J.C. testify via closed circuit television. According to Tamara, the State did not meet its burden under R.C. 2945.481(E) because J.C. did not testify at the hearing on the State's motion. Tamara further contends that the State improperly relied on hearsay and failed to establish a proper foundation for the testimony of J.C.'s counselor. Finally, Tamara contends that the State failed to comply with the time requirements in R.C. 2945.481.

**{¶ 75}** The jury trial in this case began on November 16, 2016. During trial, on November 22, 2016, the State filed a motion pursuant to R.C. 2945.481, asking the trial court to allow J.C.'s testimony to be taken outside the presence of the defendants. On November 23, 2016, the trial court held a hearing and granted the motion. J.C.'s testimony was then presented to the jury via closed-circuit television.

**{¶ 76}** R.C. 2945.481 outlines various alternatives for testimony of child sex offense victims who are less than 13 years old when an indictment, complaint, or information is filed. As relevant here, R.C. 2945.481(C) provides that in any such sex abuse proceeding:

[T]he prosecution may file a motion with the judge requesting the judge to order the testimony of the child victim to be taken in a room other than the room in which the proceeding is being conducted and be televised, by closed circuit equipment, into the room in which the proceeding is being conducted to be viewed by the jury, if applicable, the defendant, and any

other persons who are not permitted in the room in which the testimony is to be taken but who would have been present during the testimony of the child victim had it been given in the room in which the proceeding is being conducted. Except for good cause shown, the prosecution shall file a motion under this division at least seven days before the date of the proceeding. The judge may issue the order upon the motion of the prosecution filed under this section, if the judge determines that the child victim is unavailable to testify in the room in which the proceeding is being conducted in the physical presence of the defendant, for one or more of the reasons set forth in division (E) of this section.

{¶ 77} R.C. 2945.481(E) further provides that:

For purposes of divisions (C) and (D) of this section, a judge may order the testimony of a child victim to be taken outside the room in which the proceeding is being conducted if the judge determines that the child victim is unavailable to testify in the room in the physical presence of the defendant due to one or more of the following:

(1) The persistent refusal of the child victim to testify despite judicial requests to do so;

(2) The inability of the child victim to communicate about the alleged violation or offense because of extreme fear, failure of memory, or another similar reason;

(3) The substantial likelihood that the child victim will suffer serious emotional trauma from so testifying.

{¶ 78} The ground asserted here was R.C. 2145.481(E)(3). The standard of review for decisions on such motions is "whether the trial court's findings are supported by competent, credible evidence." *Self*, 56 Ohio St.3d at 80, 564 N.E.2d 446.

{¶ 79} In reviewing Tamara's arguments, we note that at the end of the hearing on the State's request, both Tamara's and Chris's attorneys indicated that they had no objection to the State's request; they only asked that "proper measures be taken to a system be put into * * * place to preserve truthfulness and the right to confrontation," and "to have whatever system set up" so as to allow the defendants to "be in position where they could promptly assist with the Defense and make comments to their respective attorneys." Tr. at pp. 1089-1090. There is no contention on appeal that these requirements were not followed. Consequently, we review the decision only for plain error. *State v. McConnell*, 2d Dist. Montgomery No. 19993, 2004-Ohio-4263, ¶ 48. *See also Self* at 81 (under predecessor statute, which was recodified as R.C. 2945.481 in 1997, the defendant waived alleged error about a therapist's testimony by failing to assert the alleged error when he opposed the State's motion to present the victim's testimony on videotape).

{¶ 80} Reviewing for plain error, we conclude that no error, let alone plain error, occurred regarding the State's alleged failure to comply with the time requirement in R.C. 2945.481(C). In the motion, the State indicated that it had only learned on November 21, 2016, of the circumstances which prompted the motion. Since the motion was filed the next day, the State obviously demonstrated good cause for failing to file more than seven days before trial began. The defense never submitted any evidence indicating otherwise.

{¶ 81} Furthermore, Tamara's arguments about the State's alleged failure to comply with the requirements of R.C. 2945.481(E) are without merit. The Supreme Court of Ohio noted in *Self* that the testimony of the child's therapist's provided "a basis for the required finding that [the child] would suffer 'serious emotional trauma' if required to testify in her father's presence." *Self* at 81. As here, the therapist's testimony in *Self* about the serious emotional trauma was not controverted. *Id.*

{¶ 82} In the case before us, the therapist who testified (Brenda Pennington), had been a professional clinical counselor for 24 years and had treated J.C. for several months. Pennington's other credentials, including her education and training in play therapy and trauma, were also outlined during the motion hearing. Tr. at pp. 1076-1077. *Compare State v. Cooper*, 139 Ohio App.3d 149, 167, 743 N.E.2d 427 (12th Dist.2000) (social worker who was also family and child therapist was qualified to give opinion under Evid.R. 702(B) "by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony").

{¶ 83} Pennington testified in detail about J.C.'s fear of testifying in front of Tamara and Chris, and stated that doing so would cause J.C. "severe emotional trauma." Tr. at pp. 1079-1080 and 1081. Pennington indicated that part of this was based on her understanding from J.C. that J.C. "was gagged when some of this occurred. And when you're gagged, that's a very powerful kind of thing; and it's almost as if she feels she can't talk in front of them because of that." Tr. at p. 1081. Again, Tamara made no objection at the motion hearing to Pennington's competence, opinions, or testimony.

{¶ 84} As to Tamara's argument about the fact that J.C. did not testify, there is no indication in *Self* that the child victim testified during the motion hearing, and R.C.

2945.481 does not state that a child's testimony is required at the hearing.

{¶ 85} Our review of the record further indicates that J.C. was the most traumatized of the girls. Unlike her sisters, J.C. had to be removed from her grandparents' home, and she was sent to a partial hospitalization program due to the severe behaviors she demonstrated, including sexual acting out on both her sisters. Furthermore, the initiating events for the State's request were J.C.'s suicidal ideations, i.e., telling her foster parent on November 21, 2016, that she had intended to kill herself the previous evening because she did not want to testify in front of her mother and Chris. Tr. at pp. 1067-1068. J.C. also told her therapist the same thing the day before the hearing, and that she was frightened and afraid. Tr. at pp. 1080.

{¶ 86} Based on the preceding discussion, we find no error, which precludes a finding of plain error. Even if we had found plain error, there would be no basis for concluding that the trial outcome would have been otherwise or that a manifest injustice occurred. Accordingly, the Second Assignment of Error is overruled.

### III. Competency to Testify

{¶ 87} Tamara's Third Assignment of Error states as follows:

The Trial Court Erred in Finding that the Three Minor Children [J.C., K.C., D.C.] Were Competent to Testify.

{¶ 88} Under this assignment of error, Tamara contends that the trial court erred in finding that the girls were competent to testify. In support of her position, Tamara recites various portions of the competency examinations. Essentially, Tamara argues that the court did not conduct an in-depth examination and did not ask the girls if anyone

had coached them or had explained how they should present themselves at the in-camera hearing. According to Tamara, the two youngest children, K.C. and J.C., had particular difficulty understanding what was being asked.

**{¶ 89}** Evid.R. 601 provides that "[e]very person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." To decide if a child under ten years of age is competent to testify, a trial court must consider: "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." *State v. Frazier*, 61 Ohio St.3d 247, 574 N.E.2d 483 (1991), syllabus.

**{¶ 90}** "A trial court is not required, while making a competency determination, to make express findings on the considerations outlined in *Frazier*. Such a requirement would unduly burden our trial courts with unnecessary formality. Instead, the trial court is merely required to consider the *Frazier* factors while making the competency determination." *Schulte v. Schulte*, 71 Ohio St.3d 41, 43, 641 N.E.2d 719 (1994).

**{¶ 91}** " 'The fact that a child cannot remember certain generalities does not deem the child incompetent to testify. The key issue is whether the minor was able to receive accurate impressions of fact and could truthfully relate those impressions in court.' " *State v. Jordan*, 2d Dist. Montgomery No. 26163, 2016-Ohio-603, ¶ 40, quoting *State v. Brooks*, 2d Dist. Montgomery No. 18502, 2001 WL 1295285, *3 (Oct. 26, 2001).

{¶ 92} Trial courts have sound discretion over competency decisions, because they have "the opportunity to observe the child's appearance, his or her manner of responding to the questions, general demeanor and any indicia of ability to relate the facts accurately and truthfully." *Frazier*, 61 Ohio St.3d at 251, 574 N.E.2d 483. We, therefore, review the court's decision for abuse of discretion. *Jordan* at ¶ 34. An abuse of discretion indicates a trial court attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 93} After reviewing the record, we cannot find that the trial court's decision was an abuse of discretion. The trial court held separate in-chambers interviews with the girls on November 14, 2016, and inquired about the matters included within the *Frazier* factors.

{¶ 94} At the time of the interview, D.C. was nine years old and was in fourth grade. She discussed her current circumstances, where she was living, and why J.C. was not living with her grandparents, herself, and her other sister. D.C. talked about her grades in school, what she liked to eat, and what her hobbies were. When questioned about telling the truth, D.C. appropriately responded. Transcript of In-Camera Interviews, pp.

8-10. In particular, the following exchange occurred:

THE COURT: If you promise to tell the truth, what do you have to do?

THE WITNESS: Tell them the truth.

THE COURT: Okay. Do you have to promise to tell the truth before you actually tell the truth, or do you tell the truth without being promised to do so?

THE WITNESS: We tell the truth before somebody says it.

THE COURT: But if somebody asks you to take a promise –

THE WITNESS: I would.

THE COURT: – and the promise is that you would tell the truth.

THE WITNESS: Yes.

THE COURT: What's that mean?

THE WITNESS: Somebody asks you to take the promise.

THE COURT: If I ask you to promise that you'll tell the truth and then I ask you questions, what are you supposed to do?

THE WITNESS: I tell the truth.

THE COURT: If I told you that if you looked out the window now and it's nighttime –

THE WITNESS: That's a lie because it's kind of morning and it's cold.

Transcript of In-Camera Interviews at pp. 9-10.

**{¶ 95}** K.C., who was six years old, was examined next and talked about the fact that she was currently being homeschooled. She also recalled the name of her previous teacher. J.C. discussed her activities and toys with the court and had a somewhat

extended discussion with the court about computers.   In addition, K.C. showed an appreciation for what it means to tell the truth.   Specifically, the following discussion occurred:

THE COURT:   If I ask you a question, are you supposed to tell me the truth or tell me a lie?

THE WITNESS:   Not tell a lie.

THE COURT:   Not tell me a lie. Okay. If you were to take a promise, do you know what a promise means, to take a promise?

THE WITNESS:   Pinky promise.

THE COURT:   Pinky promise.   If you were to take a promise that you would tell me the truth, would you tell me the truth?

THE WITNESS:   Yeah.

THE COURT:   Do you need to take a promise before you tell me the truth?

THE WITNESS:   (Shakes head.)

THE COURT:   No, you'd tell me the truth anyway?

THE WITNESS:   (Nods head.)

* * *

THE COURT:   * * * So if I were to tell you that it's night outside, would that be the truth or a lie?

THE WITNESS:   Probably a lie.

THE COURT:   Yeah, I think so.

THE WITNESS:   But anyways, it's not.

* * *

THE COURT:    If I were to tell you that this piece of paper here was blue, is that the truth or a lie?

THE WITNESS:   A lie.

THE COURT:   What is it?

THE WITNESS:   Yellow.

Transcript of In-Camera Interviews at pp. 16-18.

{¶ 96} Tamara offers K.C.'s use of "pinky promise" as a sign that K.C. was confused and was not competent to testify.  We disagree.  K.C. clearly knew the difference between telling the truth and telling a lie.

{¶ 97} Finally, J.C., who was 8 years old, discussed where she lived, the school she attended and how she got to school, what she did the preceding week, and pertinent family members, including her grandparents, sisters, and her foster family.   When J.C. was questioned about telling the truth, the following exchange occurred:

THE COURT:   [J.C.], do you know what the difference is between telling the truth and telling a lie?

THE WITNESS:   No.

THE COURT:   No?   Do you know what it means to tell the truth?

THE WITNESS:   That you don't lie.

THE COURT:   Okay.   If I say that piece of paper is blue, is that telling the truth?

THE WITNESS:   (Shakes head.)   No.

THE COURT:   No?   What color is it?

THE WITNESS:   Yellow.

THE COURT: Yellow. Telling you that the paper was blue was what?

THE WITNESS: A lie.

THE COURT: A lie. Are you supposed to tell a lie?

THE WITNESS: No.

THE COURT: Do you know what it means to make a promise to somebody?

THE WITNESS: That you swear that you're going to take, do it.

THE COURT: Do you swear that you're gonna [sic] tell the truth, what are you supposed to do?

THE WITNESS: Tell the truth.

THE COURT: Do you need to swear to do that before you're supposed to tell the truth?

If you don't promise to tell the truth, are you still supposed to tell the truth?

THE WITNESS: No – yes.

THE COURT: I'm not trying to trick you; but I am asking questions a little too fast, I think. Okay. So you're supposed to tell the truth, and you're in the second grade.

THE WITNESS: Um-hmm.

THE COURT: And do you know what day of the week it is?

THE WITNESS: November 14.

THE COURT: I don't know; is that right?

Ms. McCormick: I'm impressed. I don't even know.

Transcript of In-Camera Interviews at pp. 32-33.

{¶ 98} Again, it is clear that J.C. understood the difference between telling the truth and lying, and that telling the truth was important, despite a bit of confusion during the exchange.

{¶ 99} After the hearing, the trial court filed an entry indicating that the girls met the standards for competency.   Again, we find no abuse of discretion in the trial court's findings.   The transcript indicates that the girls were competent under the *Frazier* factors. We also note that no objections were made after the court's competency finding, i.e., Tamara's counsel did not object at trial when D.C., J.C., or K.C. testified.

{¶ 100} Accordingly, the Third Assignment of Error is without merit and is overruled.

V.   Alleged Ineffective Assistance of Counsel

{¶ 101} Tamara's Fourth Assignment of Error states as follows:

The Trial Court Committed Reversible Error in Convicting Appellant Because Appellant Was Denied Effective Assistance of Counsel When Counsel Failed to Object to Hearsay Testimony, Failed to Object to Minor Child [J.C.] Testifying Outside the Courtroom and Failed to Object to Expert Testimony That Was Improper.

{¶ 102} Tamara raises several specific arguments under this assignment of error, and we will address them separately.   Before doing so, we will briefly outline the standards for claims of ineffective assistance of counsel.

{¶ 103} Alleged instances of ineffective assistance of trial counsel are reviewed under the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104

S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To establish ineffective assistance of counsel, a defendant must show that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were prejudicial. Prejudice is established where "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley* at paragraphs one and two of the syllabus; *Strickland* at 687-688.

{¶ 104} Courts also "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955). Defendants are entitled to "reasonable competence," not "perfect advocacy." *Maryland v. Kulbicki*, ___ U.S. ___, 136 S.Ct. 2, 5, ___ L.Ed.2d ___ (2015), citing *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003).

{¶ 105} "*Strickland* and its progeny establish that when a court is presented with an ineffective-assistance-of-counsel claim, it should look to the full record presented by the defendant to determine whether the defendant satisfied his [or her] burden to prove deficient performance." *Reeves v. Alabama*, ___ U.S. ___, 138 S.Ct. 22, 26, 199 L.Ed.2d 341 (2017) (Sotomayor, J., dissenting from denial of certiorari). "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992). Moreover, "debatable trial tactics do not establish ineffective assistance of

counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101. *See also State v. Jones*, 2015-Ohio-4116, 43 N.E.3d 833, ¶ 55 (2d Dist.)


A.   Failure to Object to Inadmissible Hearsay

{¶ 106} Under this topic, Tamara raises two points.   The first is that trial counsel rendered ineffective assistance by failing to object to the admission of an audio tape that Becky recorded.   According to Tamara, the statements in the audio recording were hearsay and cannot be excepted from the hearsay rule as excited utterances because Becky testified that the children were not upset when she made the audio recording.

{¶ 107} Becky was the third witness at trial, following Kayleigh and Logan, who called the police after hearing the recordings Becky had made.   At trial, Becky testified about her relationships with Tamara and the girls.   She also testified, without objection, about a prior allegation by D.C. in 2013 that Chris had been "touching her privates" and "smacking on her."   Tr. at p. 357.   Becky said that she had informed Tamara of D.C.'s allegation and originally believed that Tamara would take the girls to the doctor. However, she later learned that Tamara failed to do so.

{¶ 108} According to Becky, when the girls were at her home in late May 2015, J.C. complained that D.C had hit her (J.C.) in the nose and had made J.C.'s butt bleed. After Becky repeatedly told J.C. that hitting someone in the nose makes the nose bleed, J.C. said, "Oh, well[,] that must have been when Chris was picking in my butt."   Tr. at p. 367.   Becky then took the three girls to the front room of her house and told them that they were "gonna talk and that it was okay.   They couldn't lie."   Tr. at p. 368.   Becky audio-recorded her subsequent conversation with the girls (State's Ex. 1), which was

played to the jury without objection.

{¶ 109} Because there was no video-recording, the audio-recording is sometimes unclear as to which child made particular statements, particularly when the girls talked at the same time or statements were made at a softer volume. However, Becky directed some questions to a particular child, and some statements could be identified by the girls' distinct voices. During this conversation, the girls disclosed various incidents of sexual abuse by Chris.

{¶ 110} One girl can be heard to say that "he did it yesterday after school." D.C. also told Becky that, one night, J.C. and K.C. were "touched in their privates" and got "beat to death." D.C. said they were crying and that the crying could be heard from downstairs. One girl stated that Chris touched her "everywhere," including her "boobs" and "privates," and "won't keep his hands to himself." D.C. also said that Chris touched her privates and her butt and smacked her on her butt. According to J.C., Chris touched her butt, came into the bathroom when she was in there, and touched her with his hand. In addition, J.C. stated that Chris "picked at her butt" with his finger and made her poop bloody.

{¶ 111} The girls also said that Chris "smacked" all of them and hit them with a belt, a brush, and/or a stick. Furthermore, D.C. stated that Chris had punched her in her mouth and nose and had made them bleed. During the recording, Becky repeatedly asked the girls where their mother was when these events occurred, why Chris did what he did, whether the girls told their mother, what their mother had said, and if the girls were telling the truth.

{¶ 112} Tamara was not mentioned in detail during the recording (at least as to

abuse), other than that Tamara was told about these things and had told Chris not to do that anymore. According to the girls, Chris denied doing anything and continued to abuse them after that time.

{¶ 113} Tamara contends, and the State does not dispute, that the statements of D.C., J.C., and K.C. in the audio recording were hearsay and were not excluded from or did not fall within a recognized exception to the hearsay rule.

{¶ 114} After reviewing the entire record, we find that counsel's failure to object to admission of the girls' statements to Becky was harmless and could have been the result of a reasonable trial strategy. As was noted earlier, the girls' allegations of sexual and physical abuse, including Tamara's involvement, were repeated to other individuals during medical examinations and/or in counseling sessions with the girls' therapists, and the doctors and therapists testified to those statements at trial. Tamara did not object at trial to admission of these statements and has not objected to their admission on appeal. Consequently, the jury would have been aware of the allegations even if Becky's recording had been excluded.

{¶ 115} Furthermore, as we mentioned, by allowing admission of the recorded statements early in the trial, the defense was able to develop the argument that Becky and others lacked the requisite training to appropriately interview the children about the abuse. The defense was also able to attempt to establish that Becky's questions and responses to the girls affected their subsequent disclosures. As was noted earlier, the opening statements of both defense counsel stressed that the case rested on the credibility of the girls' allegations. Both defense counsel also contended that the girls had been coached and improperly interviewed, that the girls had provided inconsistent

statements, and that family members had plotted and encouraged the abuse allegations because they disliked Tamara and Chris.   Tr. at pp. 53-55 and pp. 57-59.

{¶ 116} We also noted that the same theories were reiterated during the closing arguments of both defense attorneys.  Tr. at pp. 1937, 1938-1939, 1940-1943, 1948, 1949-1951, and 1953-1954.  Notably, proving the defense theories would have been impossible if the jury had not been able to see the recorded interviews, including the original statements the girls made to Becky.

{¶ 117} Accordingly,   the   information   contained   in   Becky's   audio-recording duplicated other admissible statements, and counsel's failure to object to admission of the recording could reasonably have been part of counsel's trial strategy to undermine the credibility of the girls' subsequent statements.

{¶ 118} Tamara's second contention under the hearsay topic is that trial counsel rendered ineffective assistance by failing to object to admission of the girls' forensic interviews.   We have already discussed admission of the forensic interviews in detail in connection with our resolution of Tamara's First Assignment of Error, and need not repeat it.   Based on that discussion as well as our comments regarding the admission of Becky's audio recording, Tamara's counsel did not render ineffective assistance by failing to object to admission of the forensic interviews.


B.   Failure to Object to J.C.'s Testimony Outside the Courtroom

{¶ 119} Tamara's second major claim of alleged ineffective assistance of counsel concerns the fact that her attorney did not object either to the State's untimely motion or to the State's failure to show good cause for the untimely motion to allow J.C. to testify

outside the courtroom. Tamara also contends that J.C. should not have been allowed to testify outside the courtroom, and she argues that if her counsel had objected, the outcome of the trial could have been substantially altered.

{¶ 120} After considering Tamara's Second Assignment of Error, we found no error or plain error in the decision to allow J.C. to testify outside the courtroom. We also concluded that the trial outcome would not have been otherwise, and that a manifest injustice did not occur. Furthermore, Tamara failed to present any argument with respect to how the trial outcome would have been different if J.C. had been required to testify in the courtroom. Accordingly, this part of the claim of ineffective assistance of counsel is without merit.


### C. Failure to Object to Alleged Improper Expert Testimony

{¶ 121} Tamara's final claim of ineffective assistance of counsel concerns trial counsel's failure to object to the testimony of Dr. Duffee. According to Tamara, Dr. Duffee's testimony was improper because he commented on the girls' conduct rather than testifying about general knowledge of behaviors of abused children. As examples, Tamara points to four specific lines of questioning, found at pages 1724, 1727, 1729, and 1730 of the trial transcript. We will discuss these lines of questioning after setting out a few general principles.

{¶ 122} Under Evid.R. 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by the expert or admitted in evidence at the hearing." The Supreme Court of Ohio has held that expert "testimony that the behavior of an alleged child victim of sexual abuse is consistent with behavior

observed in sexually abused children is admissible under the Ohio Rules of Evidence." *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998). The basis for this is that "[a]n expert psychologist's training and professional experience provides the expert with specialized knowledge of the kind recognized under Evid.R. 702 that the average person lacks about behavioral characteristics of minor victims of sexual abuse." *State v. Artz*, 2015-Ohio-5291, 54 N.E.3d 784, ¶ 57 (2d Dist.).

**{¶ 123}** We stressed in *Artz* that experts cannot offer direct opinions about whether a child is telling the truth. *Id.*, citing *State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 42, which, in turn, cites *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), syllabus. However, a distinction exists "between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused." (Emphasis sic.) *Stowers* at 262. *Accord Artz* at ¶ 62; *Rosas* at ¶ 42. Thus, the State may present "testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis sic.) *Stowers* at 263.

**{¶ 124}** Bearing these principles in mind, we will consider Dr. Duffee's testimony. At trial, the court accepted Dr. Duffee as an expert in pediatric medicine and pediatric psychiatry. In addition to other credentials, Dr. Duffee was board certified in general psychiatry, child psychiatry, and pediatrics, and had founded the Rocking Horse Center.

**{¶ 125}** Dr. Duffee stated that he had reviewed the records of D.C., J.C., and K.C., but had not personally met with them. He provided background information on sexual abuse of children and delayed disclosure of sexual abuse. At the first three cited pages

of the transcript (1724, 1727, and 1729), the State posed the following questions:

Q:   Now, we also heard some testimony that one of the siblings may have been sexually acting out on other siblings.   You had touched on that before.   Can you explain why one sibling may sexually act out on other siblings?   (Tr. at p. 1724.)

* * *

Q:   Now, we heard some information about how these children did when they had started therapy; and one of the therapists had described the youngest child, 6-year-old [K.C.], in a session where she had used a bop bag.   She identified it as Chris and she stomped on the bop bag.   She took a knife, she put it to the therapist's throat [and expressed wanting to cut off the therapist's and Chris's head.] * * * Can you give us some insight as to what's going on when a child shows that sort of – demonstrates that type of violent behavior in a therapy session, a play therapy session.   (Tr. at p. 1727.)

* * *

Q:   Now, we've heard one of the therapists describe 9-year-old [D.C.] in her therapy sessions as making disclosures in what seemed to be a different – unique [way] to me.   One way she disclosed [was] while she wore a Teenage Mutant Ninja Turtle mask throughout the session.   Another time she was making disclosures by going into a closet, talking to a ghost, coming out, and making a statement. * * * Can you give us some insight into what's going on – [?]   (Tr. at p. 1729.)

{¶ 126} In answering these questions, Dr. Duffee explained how children who have been sexually abused may manifest those behaviors, but he did not express an opinion about whether D.C., J.C., and K.C. were truthful in their allegations. For example, the evidence in the case indicated that J.C. had acted out sexually on her sisters. In responding to the question about why one sibling may act out on other siblings, Dr. Duffee explained the behavior as "turning passive into active. When the child is passively a victim, one of the ways that they can deal with the anxiety of being a victim is turning it around and becoming the * * * perpetrator." Tr. at pp. 1724-1725. Dr. Duffee continued by stating that:

> Now, I would also say in a younger age group, again, with certain families, even multi-generational families, sexual touching may be part of life and may be normalized and may be something that they do. And as a younger child, I mean, until they get into elementary school, they may not know any different. They may not know that's not something that's socially appropriate.

Tr. at p. 1725.

{¶ 127} Dr. Duffee also answered the prosecutor's questions about K.C.'s and D.C.'s therapy sessions by stating how he would interpret, in general, those behaviors in therapy sessions. Concerning K.C.'s violent outburst, Dr. Duffee said that:

> Well, in general, of course, * * * that would make me think that the child is actually engaging with the rage that she feels about being a victim; that one of the techniques in therapy is when you have * * * the content, you look for emotion to put with the content. And if you have the emotion * * *,

you look for content.   'Cause a lot of times those two things are separated.   So you try to pull them together.   You also try to teach kids how to express their anger in safe ways, like using a pillow but not using the therapist * * *   But it sounds like to me like that would be more of the situation where the child is actually primally in touch with the rage that she feels about the situation.

Tr. at pp. 1727-1728.)

{¶ 128} Regarding D.C.'s use of a mask or going into a closet and talking to a ghost, Dr. Duffee indicated that these kinds of acts illustrated depersonalization, which was a subject he had already discussed.   Tr. at p. 1729.   As to how this would work, Dr. Duffee explained that "[the abuse] didn't happen to me; it happened to somebody else.   It happened in a dream.   It happened to my friend.   Those are fascinating ways that a child could protect herself from saying this happened to me and I am the victim, and it shows that she's making progress; but it also, you know, shows that she's got a long way to go."   Tr. at pp. 1729-1730.

{¶ 129} None of Dr. Duffee's responses directly asserted that D.C., J.C., and K.C.'s abuse allegations were truthful.   Instead, his testimony generally informed the jury about how children typically disclose sexual abuse, the reasons why disclosure is often delayed and gradual, and how reactions to the allegations can affect future disclosures.

{¶ 130} For example, Dr. Duffee stated, generally, that malicious and false reporting of sexual abuse is rare, and that "the initial disclosure [by younger children] is almost always correct."   Tr. at p. 1715.   He described common patterns of behavior of children who have been sexually abused, and also explained how children commonly

deal with the trauma that abuse causes. These coping mechanisms include repeating the abusive behavior, psychic numbing (where children distance themselves from their emotions), derealization (it happened in a dream), depersonalization (it happened to someone else), and dissociation (zoning out). Tr. at pp. 1705-1709, 1717, 1724, 1728-1729, and 1731-1732. To the extent that Dr. Duffee was asked about specific behavior exhibited by D.C., J.C., and K.C., his testimony indicated how their behaviors fit within the concepts he previously described and why, in general, children may exhibit those behaviors. Dr. Duffee's testimony in this regard was admissible, and Tamara's trial counsel was not ineffective in failing to object.

{¶ 131} Tamara further contends that Dr. Duffee improperly testified that he would find the girls' disclosures to be credible. In this context, Tamara relies on the following exchange that occurred at p. 1730 of Dr. Duffee's direct examination:

Q: Now, we had also heard that this same child [D.C.] had made disclosures that she witnessed Mom harm cousins. Based on your training, education, and experience, is that also, to push abuse off onto a completely different person, is that another way of depersonalizing and dissociating?

A: Well, as a pediatrician, *I would be concerned and I would have to report that and kind of take it at face value first*; but beyond that, I would say that, yes, I think that it's very common for kids to say that this happened to my cousin or this happened to my sister because they're unable to say this happened to me, yet. And eventually they'll be able to say this happened to me. And those aren't contradictions. Those are just incremental

disclosures and somehow this happened to somebody else; and eventually they'll be able to say, well, yes, it happened to me and then I can close it off and I can go on with my life.

(Emphasis added.) Tr. at p. 1730.

{¶ 132} Contrary to Tamara's assertion, Dr. Duffee's response did not indicate that he found D.C.'s disclosure to be credible. Instead, Dr. Duffee's complete response indicated that, as a doctor with an obligation to report suspected abuse, he was initially required to take this kind of allegation at face value. Notably, Dr. Vavul-Roediger made a similar comment during her testimony. Tr. at p. 758.

{¶ 133} As we mentioned, Dr. Duffee also said that it would not be uncommon for a child to depersonalize the abuse and report it as having occurred against another person. We find nothing in Dr. Duffee's answer to mean that he found D.C., J.C., and K.C. to be credible and their allegations to be truthful.

{¶ 134} Accordingly, the Fourth Assignment of Error is overruled.

VI. Insufficiency and Manifest Weight of the Evidence

{¶ 135} Tamara's Fifth Assignment of Error states that:

The Trial Court Committed Reversible Error in Convicting Appellant Because the State Failed to Present Sufficient Evidence and the Conviction Is Against the Manifest Weight of the Evidence.

{¶ 136} Under this assignment of error, Tamara contends that her convictions for rape are not supported by sufficient evidence and are against the manifest weight of the evidence because the State did not provide sufficient evidence of penetration. In this

regard, Tamara contends that the minor children testified only to touching, not to penetration.

{¶ 137} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).   In this situation, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states that:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.   The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶ 138} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *Wilson* at ¶ 12.   In this situation, a court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   The discretionary power to grant a

new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 193.

{¶ 139} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Flores-Lopez*, 2017-Ohio-690, 85 N.E.3d 534, ¶ 49 (2d. Dist.) Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15. *Accord Flores-Lopez* at ¶ 49.

{¶ 140} Furthermore, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 141} In addressing Tamara's arguments, the State notes that the counts being challenged are Counts 24 and 39, and we agree. Count 24 (Rape) of the indictment alleged that "as a continuous course of conduct from on or about March 15, 2013, to May 29, 2015," Tamara had engaged in sexual conduct with J.C., in violation of R.C.

2907.02(A)(1)(b). Doc. #1, p. 7. Two specifications were included, i.e., that J.C. was under the age of 10 and that Tamara compelled her to submit by force or threat of force. *Id.* According to the bill of particulars for Count 24:

> Tamara Remy did engage in sexual conduct with the victim (J.C. * * *), not her spouse and the victim was less than 13 years of age. The victim was less than 10 years of age at the time of the offense and Tamara Remy purposely compelled the victim to submit by force or threat of force.

> Tamara Remy digitally penetrated J.C.'s vagina under force or threat of force.

Doc. # 12 at p. 2.

**{¶ 142}** Count 39 (Complicity to Rape) of the indictment alleged that "as a continuous course of conduct from March 15, 2013, to on or about May 29, 2015," Tamara had engaged in sexual conduct with K.C., in violation of R.C. 2907.02(A)(1)(b). Doc. #1 at p. 11. Two specifications were included, i.e., that K.C. was under the age of 10 and that Tamara compelled her to submit by force or threat of force. *Id.* With respect to Count 39, the bill of particulars stated that:

> Tamara Remy, acting with the kind of culpability required for the commission of the offense of rape, did aid or abet another in committing the offense of rape. Tamara Remy did aid and abet Christopher Remy in engaging in sexual conduct with the victim (K.C. * * *), who was not his spouse and the victim was less than 13 years of age. The victim was less than 10 years of age at the time of the offense and Tamara Remy purposely compelled the victim to submit by force or threat of force.

Tamara Remy did compel K.C. to engage in fellatio with Christopher Remy by restraining her during the incident.

Doc. #12 at p. 2.

**{¶ 143}** In closing argument, the State commented with respect to Count 24 that it involved digital penetration of the vagina, and referenced J.C.'s statements to Dr. Vavul-Roediger and to J.C.'s therapist. Regarding Count 39, the State referenced K.C.'s therapy records, in which K.C. stated that Tamara had opened her mouth so that Chris could put his penis inside and that if K.C. did not do it, Tamara would punish her. Tr. at p. 1917.

**{¶ 144}** R.C. 2907.02(A)(1) provides that:

No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

**{¶ 145}** Regarding complicity to rape, R.C. 2923.03(A) states that "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) [a]id or abet another in committing the offense." In such situations, R.C. 2923.03(F) provides that "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender."

**{¶ 146}** R.C. 2907.01(A) defines "sexual conduct" as "vaginal intercourse between

a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another.   Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 147} According to Tamara, there was insufficient evidence of penetration because the children testified only to touching.   This is incorrect.

{¶ 148} Although the girls did not initially disclose sexual abuse by Tamara, they later began disclosing and discussing Tamara's sexual abuse.   On October 12, 2015, J.C. was examined at Dayton Children's Hospital by Dr. Vavul-Roediger.   During the examination, the doctor asked J.C. why she had gone to live with her Mammaw and Pappaw.   At that point, J.C.'s demeanor changed and she appeared anxious.   Tr. at p. 711 (Dr. Vavul-Roediger).     J.C. told the doctor that " 'They was hurting me.   They was touching me *in* my private parts.' "   (Emphasis added).   State's Ex. 18, p. 2 (Dayton Children's Hospital Records); Tr. at p. 711.   When the doctor asked J.C. who was hurting her, J.C. said, " 'My Mom and Chris.' "   Ex. 18 at p. 2; Tr. at p. 712.

{¶ 149} Dr. Vavul-Roediger asked J.C. to identify what she believed were her private parts, and J.C. "pointed to her own breast or chest area as well as her genital area and anal areas with her finger. * * * [J.C.] called her breast area B, the letter B.   She referred to her genital area as pee-pee, and her anal area as, butt."   Tr. at pp. 712-713. *See also* Ex. 18 at p. 3.   When the doctor asked J.C. what happened to those parts of her body with Chris, J.C. pointed to each of those areas, again, with her fingers, and indicated she had been touched there."   Tr. at p. 713.   The doctor then asked J.C. if

anything had happened with her Mom, and J.C. said, " 'My Mom was doin' *the same things* to me that Chris was doin'.' " (Emphasis added.) Ex. 18 at p. 3; Tr. at p. 713.

**{¶ 150}** At trial, J.C., then eight years old, testified that Chris hurt her "in my private parts" when she lived at Tamara's house. Tr. at p. 1402. J.C. was later asked what Chris did, and she responded that he "touched me on my private parts." Tr. at p. 1406. J.C. identified her "private parts" as "[m]y vagina and my butt," and stated that Chris had touched her more than once with his hand, both outside and underneath her clothing. *Id.* J.C. indicated that Chris also touched her breasts. Tr. at p. 1407. J.C. further said that she told Chris to stop, but he did not. *Id.* When asked if she remembered what it felt like when Remy touched her on her butt with his fingers, J.C. responded, "Weird." Tr. at p. 1408. J.C. also said she did not remember what it felt like when Chris touched her vagina with his fingers. *Id.*

**{¶ 151}** In addition, J.C. described that sometimes Chris wanted "to touch my private parts and did not want to use his belt, so he used a glove" on his hand. Tr. at p. 1421.

**{¶ 152}** J.C. had previously made disclosures about Chris's actions toward her. In Becky's audio-recording, J.C. initially stated that Chris "picked at" her "butt" and caused it to bleed. When Becky asked if Chris had put his finger in J.C.'s butt, J.C. responded affirmatively.

**{¶ 153}** Moreover, J.C. made statements to her counselor and a medical doctor that indicated penetration by Chris. On August 19, 2015, J.C. stated at a therapy session with Rayna Jensen that "Chris touched us *in* our private parts." (Emphasis added.) Tr. at p. 1446.

**{¶ 154}** At trial, the following exchange also occurred:

Q. Did you ask [J.C.] if her parents, her mom, or Chris told her anything?

A. Yes. I asked her if her mom or Chris had ever told her anything, and she said, they said if you guys tell, that you will get in trouble. And I asked the child what she thought would happen, and [J.C.] said, they said Kelly would take us to a new home.

I asked her who Kelly is and the child said, someone who takes care of little kids, and then [J.C.] went on and said, I told and see I had to move to a new home.

Tr. at pp. 713-714. The same account is documented in the hospital records. *See* Ex. 18 at p. 3.

**{¶ 155}** In light of the foregoing testimony, we conclude that, viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence of penetration. Courts have found sufficient evidence where a witness or victim stated that the defendant's penis or other objects were "in" or "inside" the victim's vagina or anus. *See State v. Bowers*, 4th Dist. Hocking No. 06CA7, 2007-Ohio-3986, ¶ 30-31; *In re J.A.*, 2d Dist. Montgomery No. 23059, 2009-Ohio-2321, ¶ 12 (juvenile victim said that defendant put his penis up or in victim's butt); *State v. Jackson*, 2015-Ohio-5490, 63 N.E.3d 410, ¶ 44 (2d Dist.) (victim's statement that defendant twice " 'fingered her vagina on the inside' * * * met elements of engaging in sexual conduct"); *State v. White*, 3d Dist. Seneca No. 13-16-21, 2017-Ohio-1488, ¶ 36 (victim's testimony that defendant " 'put his fingers down in [her] vagina' " was sufficient evidence of sexual conduct); *State v. Wright*, 6th Dist. Lucas No. L-12-1327, 2013-Ohio-5910, ¶ 13 (victim's statement that defendant touched

her skin " '*and then* he put his fingers up there' " appeared "to mean insertion" for purposes of sexual conduct) (Emphasis sic.); *State v. Smith*, 10th Dist. Franklin No. 03AP-1157, 2004-Ohio-4786, ¶ 19 (testimony of digital penetration sufficient where victim "testified that defendant put his finger in her 'pee-pee' "). Accordingly, there was sufficient evidence to support Tamara's conviction on Count 24.

{¶ 156} Furthermore, with respect to Count 39, which alleged fellatio, the State was not required to prove penetration. " 'Fellatio is committed by touching the male sex organ with any part of the mouth.' " *State v. Hudson*, 2d Dist. Montgomery No. 22793, 2009-Ohio-2776, ¶ 42, quoting *State v. Long*, 64 Ohio App.3d 615, 618, 582 N.E.2d 626 (9th Dist.). Oral penetration is not required. *State v. Molen*, 2d Dist. Montgomery No. 21941, 2008-Ohio-6237, ¶ 38.

{¶ 157} However, even if penetration had been required, it was clearly established. From the beginning of the case, K.C. had alleged that Chris put his "weiner" in her mouth. She spontaneously made this comment to a police officer while at the CAC, and then made additional comments to that effect on various occasions, including during her initial medical examination on May 29, 2015, and to her therapist. *See, e.g.*, State's Ex. 2A, p. 4 (medical records for May 29, 2015); Tr. at p. 517 (Belinda Dewberry, Dayton Children's Hospital social worker); Tr. at pp. 530, 534, 537 (Dr. Vipul Garg); and Tr. at p. 1260 (Sherri Grimone, K.C.'s therapist, testifying about K.C.'s comments on June 30, 2015).

{¶ 158} After additional disclosures of sexual abuse, K.C. was examined by Dr. Vavul-Roediger at Dayton Children's Hospital on October 12, 2015. At that time, K.C. told the doctor that Chris and her mom were hurting the girls, and again said that Chris

was putting his "private" (meaning penis) in her mouth. When the doctor later reminded K.C. that she had said her mother was hurting her, K.C. agreed that she remembered saying it, but did not want to talk about it further on that visit. State's Ex. 2B, p. 2 (medical records for October 15, 2015); Tr. at pp. 740-742 (testimony of Dr. Vavul-Roediger).

{¶ 159} Previously, in a session on October 7, 2015, K.C. told her therapist that "My mom would open my mouth and Chris would put his private parts in my mouth." This was a direct quote from K.C. Tr. at p. 1289 (testimony of Sherri Grimone); State's Ex. 16 (progress notes for K.C. from October 7, 2015). K.C. made the same statement in another therapy session on November 8, 2015. Tr. at p. 1303. On December 2, 2015, K.C. told her therapist that: "My mom would not stop Chris from hurting us and that was bad. My mom would open my mouth and say shut up." Tr. at p. 1305. K.C. also said that when she would not open her mouth, her mother would whip her and so would Chris. *Id.*

{¶ 160} Additionally, K.C. made similar statements to her therapist on December 9, 2015. At that time, K.C. said that her mother would open her mouth so that Chris could put his penis in her mouth, and that if she did not do this, her mother would punish her. K.C. also said that she was afraid and that she threw up. Tr. at 1307.

{¶ 161} In light of the above testimony, there was sufficient evidence to support the conviction on Count 39.

{¶ 162} In her brief, Tamara has not specifically indicated why the convictions for Counts 24 and 39 are against the manifest weight of the evidence, other than arguing that there was only evidence of touching, rather than penetration. Again, we disagree. Having reviewed the entire record, and having considered all other matters pertinent to a

manifest weight review, we cannot conclude that " 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. As was noted, we give the jury's credibility decisions substantial deference because the jury has the opportunity to see the witnesses. *Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, at *4. Finally, this is not " 'the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

**{¶ 163}** Based on the preceding discussion, the Fifth Assignment of Error is overruled.

## VII.    Conclusion

**{¶ 164}** All of Tamara's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies mailed to:

Andrew P. Pickering
Kiriakos G. Kordalis
Hon. Richard J. O'Neill