[Cite as *Parma Hts. v. Brett*, 2025-Ohio-4.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

CITY OF PARMA HEIGHTS,　　　　　:

　　　　Plaintiff-Appellee,　　　　:

　　　　　　　　　　　　　　　　　　　No. 113564

　　　　v.　　　　　　　　　　　　　:

DENNIS A. BRETT,　　　　　　　　:

　　　　Defendant-Appellant.　　　:

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 2, 2025

---

Criminal Appeal from the Parma Municipal Court
Case No. 23CRB01349

---

*Appearances:*

Bryan O'Malley, Assistant Law Director & Prosecutor, City
of Parma Heights, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and
Britta Barthol, Assistant Public Defender, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Dennis A. Brett ("Brett") challenges his conviction for menacing by stalking, as charged by the City of Parma Heights ("the City"). He assigns two errors for our review:

I. The evidence produced at trial was insufficient to support appellant's conviction for menacing by stalking.

II. The manifest weight of the evidence did not support appellant's conviction for menacing by stalking.

## I. Factual and Procedural History

{¶ 2} On April 16, 2023, Brett was charged with one count of menacing by stalking in violation of R.C. 2903.211, a first-degree misdemeanor. Brett entered a not guilty plea, and the matter proceeded to a two-day bench trial on October 30, 2023, and November 13, 2023, where the following relevant facts were adduced.

{¶ 3} Brett and the victim, C.G., first met at their place of employment, The Cleveland Plain Dealer — Brett as a newspaper deliverer and C.G. as a newspaper bagger. The two became acquainted in early 2022 and engaged in "mutual conversation" and eventually began having longer conversations. (Oct. 30, 2023, tr. 70.) The conversations eventually became "intimate," and C.G. described that "[Brett] had given me his phone number several times, three at least; expressed that he was interested in me and attracted to me; and asked [about] my relationship status with [J.F.]" (Oct. 30, 2023, tr. 71.) When asked if she reciprocated these feelings, C.G. testified that she "stay[ed] neutral" because she did not want to hurt Brett's feelings, and eventually directly expressed that she was not interested in him on two separate occasions. (Oct. 30, 2023, tr. 71 and 72.) C.G. testified that when she realized that Brett was persistent in his feelings towards her, she attempted to have conversations with Brett to convey that she was not interested, but she felt that Brett "just wasn't getting it." (Oct. 30, 2023, tr. 76.) She did not report Brett's

activity to her employer until after the police became involved.  By late 2022, C.G. became persistent in telling Brett that she was not interested, and eventually became frustrated that Brett was not respecting her express rejection of his advances, and eventually, in January 2023, told him to "leave [her] the f--- alone." (Oct. 30, 2023, tr. 76.)  C.G. testified that during this time, she never called Brett on the phone, invited him to her home, or told him her address.

{¶ 4} C.G.'s boyfriend of eight years, J.F., told her that he had seen a vehicle in the neighborhood multiple times, which C.G. had figured out belonged to Brett. J.F. testified that in March 2023, he was at C.G.'s home working on maintenance around the home when he noticed Brett's vehicle, a black GMC, driving around C.G.'s street "for the third time in a two week span." (Oct. 30, 2023, tr. 8.)  J.F. estimated that he had seen what appeared to be Brett's vehicle around C.G.'s home on February 27, March 3, March 8, and March 10, 2023, and only took down the license plate on March 8.

{¶ 5} On March 14, 2023, C.G. pulled into a nearby apartment complex around 1 a.m. to make a delivery for Uber Eats when she noticed Brett's vehicle parked in the parking lot, which surprised her.  C.G. admitted that Brett would not have access to her Uber Eats information, and no testimony at trial explains how or why Brett and C.G. both ended up in the same parking lot on this date.

{¶ 6} C.G. remained in her vehicle but confronted Brett on this date, and while she made small talk with him, she telephoned the Parma Heights Police Department.  Though she was heavily breathing and nervous after seeing Brett, she

testified that he did not do anything to make her feel as though he was going to physically harm her. Two officers responded to the scene, and she explained to them that she was suspicious of Brett's activity because J.F. had, less than 24 hours before the incident, told her that he had spotted Brett's vehicle on her street on three or four occasions. Notably, Officer Donovan Flynn ("Ofc. Flynn") testified that C.G. told him that Brett followed her to the complex, which contradicted C.G.'s own testimony that Brett had already been in the parking lot when she pulled in.

{¶ 7} Brett informed the officers that he knew C.G. from work and that he was looking around the area for housing, but that he had not spoken to C.G. in two months. Ofc. Flynn also spoke with C.G. and told her to keep a log of instances where Brett drives past her home. Ofc. Flynn then told Brett to stay away from C.G. and her home, and explicitly warned Brett that if C.G. decided to file a report, he could be arrested and charged with menacing by stalking.

{¶ 8} Two days later, C.G. met with the Parma Heights Police to make a report documenting the instances where Brett drove past her house. She did not have any evidence or information other than the information that she had learned from J.F.

{¶ 9} On March 31, 2023, S.B. and M.B., who live on C.G.'s street but had never spoken to C.G. prior to the morning of trial, reported to the Parma Heights Police that a black GMC vehicle with a loud exhaust had been pulling in and out of their driveway every night for the past two weeks. At trial, S.B. testified that the vehicle would "every night, drive just past my house, stop, back up past my driveway,

pull in my driveway, back out, go back up [C.G. and S.B.'s residential street] . . . . This went on for multiple nights." (Oct. 30, 2023, tr. 17.) S.B. estimated that he had seen the black GMC approximately 20 times through the span of one month. At trial, M.B.'s testimony corroborated S.B.'s testimony.

{¶ 10} S.B. continued to observe the dark GMC and filed a police report on April 5, 2023. In this report, S.B. reported the license plate number. Officer Joseph Rizk ("Ofc. Rizk"), who took in the report, contacted Brett after matching the license plate number to Brett. Brett informed Ofc. Rizk that he was looking for housing in the area. When Ofc. Rizk told Brett that a homeowner had complained about him using his driveway to turn around, Brett stated that he would stop.

{¶ 11} After S.B. made his report, Ofc. Rizk realized that C.G.'s reports and S.B.'s reports may have been related and called C.G. to tell her about the activity that S.B. had reported. This phone call made her "absolutely petrified." (Oct. 23, 2023, tr. 96.)

{¶ 12} Brett and C.G. did not have any contact until April 16, 2023, around 11 p.m. C.G. testified that she arrived back at her home after making an Uber Eats delivery and saw Brett's vehicle across the street backing out of a driveway. She followed him and checked to see if the license plate number matched Brett's; it did. As she followed him, she called the police who responded to the scene and pulled Brett's vehicle over.

{¶ 13} C.G. drove directly to the police department to make another police report. As she was filling out the police report, an officer notified her that Brett was

on his way to the police station. Officer Philip Onysyk ("Ofc. Onysyk") testified that he was at the station last night and interacted with C.G. and Brett. According to Ofc. Onysyk, Brett came into the police station lobby on his own; the police had not compelled him to come there. C.G. testified that when Brett arrived at the police station, she decided to have a "mediated" conversation with him. She testified that she was comfortable doing so in the company of the police.

{¶ 14} When she asked him how he had found out where she lived, Brett evidently responded that "it's all over the internet." (Oct. 30, 2023, tr. 100.) C.G. also asked Brett why he was following her and driving by her house, and he informed her that she "[has] a prostitution ring going on at [her] house and he was there to protect [her.]" (Oct. 30, 2023, tr. 101.) Ofc. Flynn supervised the conversation and testified as to several details at trial. During the conversation, Brett "explained his concerns that [C.G.] was having a prostitution ring at her house, based on the cars coming and going. He admitted that he had been past the [house] a number of times and was familiar enough with the cars that had been parked in the driveway and were no longer parked there." (Oct. 30, 2023, tr. 141.) C.G. explained that she had four of five rental vehicles during this time due to ongoing vehicle maintenance and that was what Brett had observed. Brett did not accept this explanation and "continued to badger her" and "told her that he deserved the truth from her," and that "she needed to tell him and answer his questions to his satisfaction." (Oct. 30, 2023, tr. 142.)

Ofc. Flynn elaborated that the conversation went from being a relatively even two-sided conversation to a much more one-sided, almost interrogation type conversation, where she would give him — again, she didn't want to give him all the details of her personal life, as is her right, but he was not satisfied with that, so he would continue to dig in to get those points, and not be satisfied with her answers and try to force her to give more information that she was not willing to give.

(Oct. 30, 2023, tr. 144.) Eventually, it was clear that the conversation was ineffective. C.G. became emotional and uncomfortable, and Ofc. Flynn suggested that they step out of the lobby, which was when C.G. informed Ofc. Flynn that she wished to press charges against Brett.

{¶ 15} Ofc. Onysyk testified that he also spoke with Brett that evening, and Brett told him that "he's been going up and down her street, approximately, six or seven times in the prior month to check on cars that were in her driveway, because he believed she was prostituting." (Nov. 13, 2023, tr. 8.) Ofc. Flynn corroborated this testimony, and the body-camera footage of this conversation was admitted into evidence at the close of trial.

{¶ 16} Regarding the effect of Brett's activity, C.G. testified that her numerous encounters with Brett in her neighborhood were "frightening" and "totally freaked [her] out." (Oct. 30, 2023, tr. 83.) She elaborated that she had "panic attacks" that caused her to breathe heavily and repeat herself and described it as a "complete state of shock." (Oct. 30, 2023, tr. 84.) C.G. also used the word "terrified" and elaborated that she was scared because she did not understand "what this was all about, what his intentions [were]." (Oct. 30, 2023, tr. 84.) She also testified that as Brett's behavior continued, she began to have sleeping problems.

She also purchased a stun gun, purchased a subscription for her doorbell camera to retain footage, sleeps with a baseball bat in her room, and keeps her bedroom door locked when she is sleeping. She also had one session with a psychiatrist at MetroHealth to address her mental-health problems.

{¶ 17} On November 20, 2023, the court found Brett guilty of menacing by stalking and set sentencing for December 11, 2023.

{¶ 18} Brett was sentenced to suspended fines and jail time, but in lieu of the jail sentence, was placed on 24 months of probation and required to serve 30 days of house arrest. The court also ordered him to refrain from contacting C.G. while they are both at work and was ordered to stay 500 feet away from the victim's residence "or any fitness center in the Parma Court District," and ice rinks in Cuyahoga County.

## II. Law and Analysis

{¶ 19} Brett's assignments of error concern the manifest weight and sufficiency of the evidence supporting his conviction of menacing by stalking. For ease of discussion, we address the assignments of error out of order.

{¶ 20} To obtain a conviction of menacing by stalking, the City was required to prove that Brett violated the following statute:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person . . . or cause mental distress to the other person. . . .

R.C. 2903.211(A)(1).

{¶ 21} The Ohio Supreme Court recently clarified that

> [w]hen reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.,* 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 12. The *Z.C.* Court identified that the reviewing court must be mindful of the presumption in favor of the finder of fact, and """[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.""" *Id.* at id. quoting *Eastley* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

{¶ 22} In his manifest-weight challenge, Brett specifically challenges C.G.'s credibility regarding her testimony that she suffered from mental distress.

{¶ 23} Pursuant to R.C. 2903.211(D)(2), "mental distress" means

> (a) [a]ny mental illness or condition that involves some temporary substantial incapacity or (b) [a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

Brett claims that it is unreasonable to believe that C.G. would "suffer mental distress, as defined by the statute, from the incidents reported in this case."

{¶ 24} Brett's argument hinges on C.G.'s "inconsistent" behavior; Brett argues that C.G. could not have suffered mental distress during the March 14 and April 16 incidents because she confronted him first. Brett also claims that

purchasing a stun gun and pepper spray were "exaggerated" responses to Brett's conduct.

{¶ 25} We disagree. The evidence in the record demonstrates that C.G. suffered visceral mental distress from Brett's actions. C.G. used terms such as "terrified," "scared," and "petrified" to describe how Brett's conduct made her feel. She testified that she purchased a stun gun, a subscription to obtain recorded footage on her already-installed doorbell camera, sleeps with a baseball bat, and has trouble sleeping at night. Moreover, she sought mental-health treatment from a therapist and acknowledged that while she only had one session, it was difficult for her to go back because of her schedule.

{¶ 26} After a thorough review of the entire record, we cannot conclude that the finder of fact lost its way or created a manifest miscarriage of justice in finding that C.G. suffered mental distress because of Brett's actions. Though Brett contends that C.G. acted inconsistently in claiming "fear" but initiating the interactions on March 14 and April 16, Brett ignores that this activity is consistent with someone experiencing mental distress. It is clear from the record that C.G. was fearful of Brett but believed that she could resolve these problems herself, without law enforcement, until it was clear that she could not. She explained that she did not want to cause trouble and felt that her problems were too slight for police involvement. While we do not agree with Brett that her testimony was "inconsistent," even if it were, "[a] conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony." *State v. Wade*, 2008-Ohio-4574, ¶ 38

(8th Dist.). The totality of the evidence in the record does not demonstrate that the trial court's finding of mental distress created a manifest miscarriage of justice or was against the manifest weight of the evidence. Accordingly, we overrule Brett's second assignment of error.

{¶ 27} In his first assignment of error, Brett challenges the sufficiency of the evidence supporting his conviction of menacing by stalking. He argues that the evidence presented at trial was insufficient to demonstrate (1) a pattern of conduct, (2) that Brett caused C.G. to suffer mental distress, and (3) that Brett "knowingly" caused C.G. to suffer mental distress.

{¶ 28} When reviewing a case under a sufficiency-of-the-evidence standard, the reviewing court should affirm a trial court when "'the evidence is legally sufficient to support the jury verdict as a matter of law.'" *In re Z.C.* at ¶ 14, citing *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (6th Ed. 1990.) The question is not whether the evidence should be believed but whether evidence, if believed, would convince a trier of fact, beyond a reasonable doubt of the defendant's guilt. *State v. Jenks*, 61 Ohio St.3d 259, 260 (1991). When determining whether evidence is legally sufficient, the court must consider only the adequacy of the evidence presented, not its persuasiveness. *State v. Palmer*, 2024-Ohio-539, ¶ 21, citing *Disciplinary Counsel v. Smith*, 2017-Ohio-9087, ¶ 23.

{¶ 29} Brett's first challenge to the sufficiency of evidence contends that the City did not establish that he engaged in a "pattern of conduct" required for

conviction. The menacing-by-stalking statute defines "pattern of conduct" as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, or two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents . . . ." R.C. 2903.211(D)(1).

{¶ 30} Brett argues that the evidence presented at trial only established "two encounters" outside of the workplace, citing the March 14 and April 16 incidents. Brett argues that both of these encounters were initiated by C.G. rather than Brett and argues that Brett was legally parked in the apartment parking lot and that Brett was legally driving down a street and a protection order was not in place during either incident. Brett also argues that J.F., S.B., and M.B.'s testimony that Brett's vehicle was on C.G.'s street numerous times before C.G. herself even noticed cannot count as a pattern of conduct that caused C.G. mental distress.

{¶ 31} We disagree. The totality of the evidence presented, if believed, is legally sufficient to establish a "pattern of conduct." The evidence presented at trial demonstrated that between March and April 2023, Brett engaged in a "pattern of conduct." Though C.G. herself could only testify as to the two times she saw him, J.F., S.B., and M.B. all corroborated that they had seen Brett's vehicle on C.G.'s street numerous times. J.F. and S.B. both noted the same license plate number that was later discovered to belong to Brett. Moreover, on the footage from the police station, Brett admits to driving by C.G.'s home six or seven times in the prior month out of

concern that she was part of a prostitution ring.  Sufficient evidence exists to establish that Brett engaged in a "pattern of conduct."

{¶ 32} Brett also contests the mens rea of his conduct, contesting that the City did not demonstrate that he "knowingly" caused C.G. to believe that she would suffer mental distress or actually caused her mental distress.  R.C. Title 29 offers the following definition:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist.  When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 33} The record contains evidence suggesting that Brett received several warnings to stay away from numerous individuals, including C.G. herself.  C.G. testified that she told Brett to "leave her alone" at least two times prior to learning that he was driving past her home.  During the March 14 incident, the police spoke with Brett and gave him a verbal warning to stay away from C.G.  Testimony was received that even after March 14, Brett was seen driving on C.G.'s street.  And, C.G. herself caught Brett on her street and followed him as she contacted the police during the April 16 incident.  It is even clear from the record that C.G. was reluctant to press charges at the time she did, electing instead to try and "mediate" the issue with him.  Only when it became clear that Brett was not understanding or respecting her wishes did she feel that it was necessary to press charges against him.

Accordingly, Brett was aware that C.G. was uncomfortable with and did not approve of his behavior, and knowingly continued to engage in this activity anyways. Accordingly, there is sufficient evidence within the record that, if believed, supports that Brett acted "knowingly."

{¶ 34} Lastly, Brett contends that insufficient evidence was introduced to demonstrate that C.G. suffered mental distress. As previously discussed, the record contains evidence supporting that C.G. suffered mental distress and such a finding by the trial court was not against the manifest weight of the evidence. Accordingly, the record also contains sufficient evidence supporting that Brett's actions caused C.G. mental distress.

{¶ 35} Brett's first assignment of error is without merit and overruled.

### III. Conclusion

{¶ 36} We affirm Brett's conviction of menacing by stalking because it is not against the manifest weight of the evidence nor based on insufficient evidence in the record.

{¶ 37} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Parma Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., CONCURS;
MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY