[Cite as *M.E. v. M.A.*, 2026-Ohio-121.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

M.E., :

      Petitioner-Appellee, : No. 115021

      v. :

M.A., :

      Respondent-Appellant. :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 15, 2026

---

Civil Appeal from the Cuyahoga County Common Pleas Court
Domestic Relations Division
Case No. DV-24-400097

---

### *Appearances:*

Asian Services in Action, Inc., Nathaniel Johnson, and Samantha Salamon, *for appellee.*

Stafford Law Co., L.P.A., and Kelley R Tauring, *for appellant.*

MICHELLE J. SHEEHAN, A.J.:

{¶ 1} Respondent-appellant M.A. ("Respondent") appeals the domestic relations court's order adopting the magistrate's order granting petitioner-appellee M.E.'s ("Petitioner") petition for a domestic-violence civil protection order

("DVCPO") against Respondent. Respondent claims that (1) the court abused its discretion in overruling his objections to the magistrate's order and adopting the DVCPO issued by the magistrate, and (2) the magistrate erred in denying Respondent's motion to strike the testimony of his seven-year-old daughter, S.A.

{¶ 2} After a thorough review of the record, we find that the domestic relations court did not abuse its discretion by adopting the magistrate's issuance of the DVCPO because there was sufficient credible evidence in the record to support the DVCPO. We further find that the court did not abuse its discretion in denying Respondent's motion to strike S.A.'s testimony. For the following reasons, we affirm the judgment of the court below.

## I. Procedural History and Relevant Facts

### A. Relevant Facts

{¶ 3} In 2015, Petitioner and Respondent were married overseas in Jordan. They have two children together: a daughter, S.A. (dob: 3/21/2017) and a son, R.A. (dob: 8/11/2021). Respondent moved to the United States soon after they were married, while Petitioner remained in Jordan until she could immigrate to the United States. Petitioner moved to the United States in June 2018. Petitioner testified that that Respondent began to physically abuse her when she moved to the United States. Petitioner stated that before Respondent would hit her or do something bad to her, he would take her phone in order to prevent her from calling 911 or her family.

### 1. December 2023 — Petitioner Leaves United States and Moves Back to Jordan

**{¶ 4}** In December 2023, Petitioner and Respondent were living together in a house in Cleveland, Ohio. Petitioner testified that during this time, Respondent was abusive towards her and even attempted to kill her. He also forced her to have sex with him. Petitioner stated that one night that December, she returned home with Respondent after being at Respondent's family's house. Respondent began to fight with Petitioner and their daughter, S.A.

**{¶ 5}** Petitioner stated that she went to S.A.'s room to stay on the couch. However, Respondent dragged her out of the room. Petitioner attempted to escape out the front door, but Respondent pulled her by the hair, grabbed her hand, and took her back to their room. When she attempted to open a window to leave, Petitioner testified Respondent shoved her and attempted to suffocate her with a pillow. Petitioner specifically stated that Respondent "brought the pillows and the blanket and he tried to kill me." Petitioner stated S.A. saved her.

**{¶ 6}** Petitioner did not report this incident to the police. Rather, she stated that Respondent's family booked her a flight back to Jordan with her children to live at the family home there. Petitioner left for Jordan with her children on December 21, 2023. Petitioner testified that Respondent did not object to her taking the children with her. Respondent disputed this, testifying that Petitioner went to Jordan because, "I guess she has like a boyfriend in Jordan. And she abducted my children."

{¶ 7} Respondent disputed Petitioner's testimony. Respondent testified that during their marriage he never physically abused Petitioner, he never placed his hands on her, he never choked her, and he never forced her to have sex with him. With respect to the December 2023 incident, Respondent testified that on December 16, 2023, there was a party at his brother's house where Petitioner beat their son and injured his lip in front of everybody. Respondent testified that he did not personally observe Petitioner beat their son. Respondent stated that when he confronted Petitioner about it, she blamed the children. Respondent testified that he was not physically violent towards Petitioner that night.

### 2. May 11, 2024 – June 14, 2024 — Petitioner Returns to United States

{¶ 8} Petitioner returned to the United States on May 11, 2024, accompanied by her children and her mother, A.A. Petitioner testified that Respondent had promised to change and that he missed his children. Yet on the night she returned, Petitioner testified that Respondent told her that he hated her and that he only told her to come back because he wanted to take the children.

{¶ 9} Petitioner stated that after she returned to the United States, Respondent would ask for their children's passports. She refused to give the passports to him. On May 19, 2023, Petitioner had another argument with Respondent concerning the children's passports. Petitioner stated that Respondent put a gun to her head and took the children's passports and told her that he wanted

to take the kids away with him. Petitioner also testified that Respondent raped her. Following this incident, Petitioner took their children and A.A. to stay in a hotel.

{¶ 10} Respondent disputed Petitioner's testimony concerning this incident. Respondent testified that the reason Petitioner left the home to stay in the hotel was because he had sent Petitioner a "foot picture" as a joke. Respondent claims that Petitioner and her mother found it disrespectful and that this is the reason they left.

{¶ 11} Petitioner returned home to Respondent's house ten days later. Petitioner explained that Respondent had promised not to do anything if she returned to the home and that he would even leave the house. Petitioner stated that while at the home, Respondent raped her and hit their daughter, S.A., twice. Respondent also engaged in verbal and mental violence.

{¶ 12} Respondent disputed Petitioner's testimony. Respondent testified that when Petitioner returned from Jordan, there was never any physical altercation between Petitioner and himself. He also stated that there were never any physical altercations between A.A. and himself. Rather, Respondent testified that A.A. assaulted him "plenty of times." Respondent stated that on June 8, 2024, A.A. hit him on the head with a shotgun because she wanted him to return the children's passports.

{¶ 13} On June 11, 2024, Petitioner stated that there was another argument between her and Respondent because she refused to go with him on his boat. This caused Respondent to tell A.A. that he wanted Petitioner to go back to Jordan with

S.A., but to leave R.A. in the United States with him. The conversation lasted until 4:00 a.m. when Respondent went to his room.

{¶ 14} Petitioner stated that she was sitting with S.A. in the living room when Respondent returned 30 minutes later. He took her phone and told Petitioner to make coffee. Petitioner testified that when she returned, S.A. was crying and told Petitioner that Respondent had hit her.

{¶ 15} On June 13, 2024, there was another altercation between Petitioner and Respondent. Petitioner stated that Respondent wanted to take their children to Chuck E. Cheese without Petitioner present. Petitioner told Respondent that if he takes the children, she would go with them. They began fighting, and Respondent grabbed her nose and hit her hand. Petitioner stated that Respondent had broken her nose at least three times in the past and that she recently had surgery on her nose in January while in Jordan. Respondent then told her, "I will kill you and I will take the kids and go away." Petitioner was able to get away from Respondent and called the police.

{¶ 16} S.A. was seven years old when she testified at that hearing. S.A. testified that she is always scared of her father, stating that "he keeps hitting me and my mom always, and I like hate when I see my dad like hitting my mom and hitting me." Respondent disagreed with S.A., testifying that he never used physical violence with his children. Respondent stated that S.A. has been "brainwashed."

{¶ 17} Petitioner testified that prior to the full hearing Respondent had been charged with 12 criminal offenses. These included charges for endangering children,

domestic violence, strangulation, and felonious assault. Petitioner, S.A., R.A., and A.A. were identified as victims in that criminal case.

**B. DVCPO Procedural History**

{¶ 18} On June 14, 2024, Petitioner filed a petition for a DVCPO against Respondent. The petition specified that since December 2023, Respondent had engaged in violent acts, forced sex, violence against children, threats, and numerous other claims. An ex parte DVCPO was issued the same day, listing Petitioner, A.A., and Petitioner's two minor children as protected persons.

{¶ 19} Prior to a full hearing on the DVCPO, the parties agreed to a date and time for the magistrate to conduct an in camera voir dire of Petitioner and Respondent's minor child, S.A., to determine S.A.'s competency to testify. The in camera voir dire of S.A. occurred on July 8, 2024, with attorneys for both parties present. The magistrate concluded that S.A. "is able to observe and recollect observations, communicate, understand the difference between truth and falsity and appreciate the responsibility to be truthful to the extent that [S.A.] would be competent to testify."[1]

{¶ 20} A full evidentiary hearing was held before a magistrate over the course of two days: October 25, 2024, and November 15, 2024. On November 21, 2024, the magistrate granted Petitioner's request for a DVCPO. Petitioner, A.A., S.A., and R.A. are the protected person's listed in the DVCPO.

---

[1] The magistrate that made the competency determination concerning S.A. retired prior to the full hearing on this matter. As such, a different magistrate was assigned to preside over the full DVCPO hearing.

{¶ 21} On December 5, 2024, Respondent filed objections to the magistrate's decision. Respondent challenged the magistrate's decision not to strike S.A.'s testimony, as well as the magistrate's evidentiary decision not to allow Respondent to introduce the proceedings of a DVCPO that Respondent had filed against Petitioner's mother, A.A. On March 19, 2025, the domestic relations court judge overruled Respondent's objections and adopted the DVCPO issued by the magistrate.

{¶ 22} Respondent appeals from the trial court's order. He raises the following two assignments of error for our review:

> 1. The trial court erred as a matter of law and abused its discretion in overruling [Respondent's] objections and adopting the DVCPO.

> 2. The trial court erred as a matter of law and abused its discretion by denying [Respondent's] motion to strike the minor child's testimony from the record.

## II. Law and Argument

### A. First Assignment of Error

{¶ 23} In the first assigned error for our review, Respondent alleges that the trial court erred as a matter of law and abused its discretion in adopting the magistrate's issuance of the DVCPO and overruling Respondent's objections to the magistrate's order. Since we find that the trial court did not err in adopting the magistrate's issuance of the DVCPO, nor did it err in overruling Respondent's objections, Respondent's first assignment of error is overruled.

### 1. Applicable Law

### a. Standard of Review

{¶ 24} "Our standard of review of determinations regarding civil protection orders depends on the nature of the challenge." *M.D. v. M.D.,* 2018-Ohio-4218, ¶ 45 (8th Dist.). Here, Respondent argues that the DVCPO should not have been issued. Thus, with respect to the issuance of a DVCPO, "our standard of review is whether there was sufficient, credible evidence to support a finding that the respondent engaged either in acts of domestic violence or acts of menacing by stalking against the petitioner." *S.M. v. T.G.,* 2025-Ohio-1448, ¶ 26.

### b. DVCPO

{¶ 25} R.C. 3113.31 and Civ.R. 65.1 govern the issuance of DVCPOs in Ohio. Under Civ.R. 65.1(F)(3) a petition for a DVCPO may be referred to a magistrate for determination. "[B]ut civil protection orders are not 'magistrate orders' as contemplated by Civ.R. 53(D) and are not subject to the requirements of Civ.R. 53 related to magistrate's orders." *M.D.* at ¶ 48. And a magistrate's order granting a DVCPO after a full hearing is not effective unless adopted by the court. *Id.* at ¶ 49, citing Civ.R. 65.1(F)(3)(c)(v). The trial court may adopt the magistrate's grant of the DVCPO "upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R. 65.1(F)(3)(c)(ii). "This review involves a review of the civil protection order signed by the magistrate after the full hearing, i.e., the petition, transcript of proceedings, or other documents are not reviewed by the trial court at this stage." *M.D.* at ¶ 49.

{¶ 26} A party may file written objections to the trial court's adoption of the DVCPO within 14 days of the filing of the order. Civ.R. 65.1(F)(3)(d)(i). "The rule does not provide for an objection to the magistrate's decision as in Civ.R. 53, but rather, it provides for an objection to the trial court's decision adopting the magistrate's decision." *M.D.*, 2018-Ohio-4218, at ¶ 51 (8th Dist.). The party filing the objections has the burden of showing that "an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii).

### 2. Analysis

### a. Evidentiary Issues Not Properly Raised

{¶ 27} As a preliminary matter, we note that Respondent's first assignment of error is limited to whether the lower court erred in overruling his objections to the magistrate's order and adopting the issuance of the DVCPO. The evidentiary arguments raised within this assignment of error are outside the scope of objections permissible under Civ.R. 65.1(F)(3)(d)(iii). And these evidentiary arguments were not specifically assigned as separate error for review.[2]

---

[2] These evidentiary issues include (1) Respondent's claim that the lower court improperly admitted a photograph of S.A.'s injury without proper authentication; and (2) Respondent's claim that the lower court improperly excluded evidence of a DVCPO that Respondent previously obtained against A.A.

{¶ 28} App.R. 16(A)(3) provides that an appellant's brief must include "[a] statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected." Pursuant to App.R. 12(A)(1)(b), we are required to determine the appeal based upon the assignments of error set forth in the briefs under App.R. 16. An appellate court may decline to address these extraneous claims. *State v. Blade,* 2023-Ohio-3054, ¶ 54 (8th Dist.).

{¶ 29} As such, our review under this assignment of error is limited to whether "an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Civ.R. 65.1(F)(3)(d)(iii).

{¶ 30} As a result, we decline to address the evidentiary issues raised in Respondent's first assignment of error and limit our review to Respondent's objection to the lower court's adoption of the magistrate's issuance of the DVCPO based on the evidence presented at the full hearing.

**b. Evidence in Support of the DVCPO**

{¶ 31} To obtain a DVCPO, "the petitioner must establish, by a preponderance of the evidence, 'that petitioner or petitioner's family or household members are in danger of domestic violence.'" *R.E.S.,* 2025-Ohio-546, at ¶ 15 (8th Dist.), quoting *Croone v. Arif,* 2014-Ohio-5546, ¶ 18 (8th Dist.), citing *Felton v. Felton,* 79 Ohio St.3d 34 (1997), paragraph two of the syllabus. R.C. 3113.31(A)(1)(a)

defines "domestic violence," in pertinent part, as the occurrence of one or more of the following acts against a family or household member:

(i) Attempting to cause or recklessly causing bodily injury;

(ii) Placing another person by threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 or 2911.211 of the Revised Code;

(iii) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(iv) Committing a sexually oriented offense.

{¶ 32} At the full hearing on the DVCPO, Petitioner presented testimony that on more than one occasion, Respondent physically assaulted her, raped her, and assaulted their daughter, S.A. Petitioner testified that in December 2023, Respondent dragged her out of S.A.'s room and, as she attempted to escape, he grabbed her and attempted to kill her, only to be saved by S.A.

{¶ 33} Petitioner also testified that when she returned to the United States in May 2024, Respondent continued to physically assault her. Petitioner testified that on May 19, 2024, Respondent put a gun to her head and demanded that she turn over their children's passports. Petitioner testified that he also raped her that day.

{¶ 34} Petitioner testified that on June 13, 2024, Petitioner grabbed her nose, knowing that he had broken her nose at least three times in the past and that she had just had surgery on her nose in January. Petitioner testified that Respondent then told her that "I will kill you and I will take the kids and go away."

{¶ 35} S.A. also testified at the hearing, stating that she feared Respondent because he kept hitting her and Petitioner. S.A. was also shown a picture of a bruise on her leg. She testified that she got the bruise when Respondent kicked her leg.

{¶ 36} Respondent challenges the claims of Petitioner and Petitioner's witnesses at trial. However, when determining whether evidence supports a lower court's determination, we must be mindful of the presumption in favor of the finder of fact and, "'[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Parma Hts. v. Brett,* 2025-Ohio-4, ¶ 21 (8th Dist.), quoting *Z.C.* at ¶ 14. The underlying rationale of giving deference to the findings of the finder of fact is that "the finder of fact is in the 'best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony.'" *State v. Jones,* 2025-Ohio-2866, ¶ 47 (8th Dist.), quoting *State v. Sheline,* 2019-Ohio-528, ¶ 100 (8th Dist.).

{¶ 37} Respondent also claims that Petitioner "repeatedly contradicted herself and her claims at the full hearing[.]" However, even if true, it is well-established that a "finder of fact is free to believe some, all, or none of a witness's testimony." *Melenick v. McManamon,* 2010-Ohio-1051, ¶ 28 (8th Dist.), citing *State v. Ghaster,* 2009-Ohio-2134, ¶ 46 (8th Dist.).

{¶ 38} In viewing the totality of the evidence presented at the full hearing, we find that there was sufficient credible evidence to support a finding that the DVCPO was necessary to protect Petitioner and the other protected parties from future acts of domestic violence. We decline to substitute our judgment for that of the lower court's. Accordingly, Respondent's first assignment of error is overruled.

**B. Second Assignment of Error – Testimony of S.A.**

{¶ 39} In the second assigned error for review, Respondent contends that the magistrate erred in denying his motion to strike the testimony of Petitioner's minor child, S.A., after she had testified at the hearing.

**1. Standard of Review**

{¶ 40} Whether to "admit or exclude evidence lies within the trial court's discretion." *Cleveland v. Myles,* 2022-Ohio-4504, ¶ 15 (8th Dist.), citing *State v. Sage,* 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. As such, we review "'a trial court's competency determination under an abuse of discretion standard; absent an abuse of discretion, competency determinations of the trial judge will not be disturbed on appeal.'" *State v. Prdigett,* 2016-Ohio-687, ¶ 11 (8th Dist.), quoting *State v. Grahek,* 2003-Ohio-2650, ¶ 22.

**2. Applicable Law**

{¶ 41} R.C. 2317.01 provides that "[a]ll persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." With respect to a child under

the age of ten, the trial court has a duty to conduct a voir dire examination of the child to determine the child's competency to testify. *State v. Cunningham,* 2008-Ohio-803, ¶ 13 (8th Dist.), citing *State v. Frazier,* 61 Ohio St.3d 247, 250-251 (1991). In making this determination, the court must consider the following:

> (1) the child's ability to receive accurate impressions of fact or observe acts about which [he or she] will testify;
>
> (2) the child's ability to recollect those impressions or observations;
>
> (3) the child's ability to communicate what was observed;
>
> (4) the child's understanding of truth and falsity; and
>
> (5) the child's appreciation of [his or her] responsibility to be truthful.

*Id.,* citing *Frazier* at 251.

### 3. Analysis

### a. Competency Determination Made by a Different Magistrate Than the Magistrate That Conducted the Full DVCPO Hearing

{¶ 42} As a preliminary matter, we note that prior to the full DVCPO hearing, the initial magistrate assigned to the case conducted an "in camera" voir dire of S.A. The magistrate concluded that S.A. "is able to observe and recollect observations, communicate, understand the difference between truth and falsity and appreciate the responsibility to be truthful to the extent that [S.A.] would be competent to testify."

{¶ 43} Respondent alleges that because the magistrate that conducted the voir dire and found S.A. competent to testify was a different magistrate than the

magistrate that conducted the full DVCPO hearing in this case, the issuance of the DVCPO must be reversed. Respondent cites to no authority in support of this claim. *See State v. Curran,* 2016-Ohio-4767, ¶ 43 (7th Dist.) (recognizing that *"Frazier* does not hold that the same judge who determines competency must also preside over the trial"). Nor is there any such requirement in R.C. 2317.01 or Evid.R. 601.

### b. S.A.'s Competency to Testify

{¶ 44} Respondent argues that S.A.'s testimony should have been struck because S.A. "immediately admitted that she has no recollection of the events of June 13, 2024, or her last interaction with [Respondent.]" However, this is not an accurate representation of S.A.'s testimony. It is true that S.A. testified that she could not recall the last time Respondent was at her house, but that does not mean S.A. did not recall the events of June 13, 2024. S.A. was shown a picture of a bruise on her leg. S.A. stated that Respondent kicked her leg and she started to cry. S.A. testified that she did not remember how he specifically kicked her, but that he did use his foot. S.A. also testified that Respondent "keeps hitting me and my mom always, and I like hate when I see my dad like hitting my mom and hitting me."

{¶ 45} "'The fact that a child cannot remember certain generalities does not deem the child incompetent to testify.'" *In re J.J.,* 2019-Ohio-866, ¶ 24 (8th Dist.), quoting *State v. Remy,* 2018-Ohio-2857, ¶ 21 (2d Dist.). Nor does providing incorrect answers necessarily render a child incompetent to testify. *In re S.M.B.,* 2019-Ohio-3578, ¶ 60 (10th Dist.). Rather, "'[t]he key issue is whether the minor was able to receive accurate impressions of fact and could truthfully relate those

impressions of fact and could truthfully relate those impressions to the court.'" *J.J.* at ¶ 24, quoting *Remy* at ¶ 21. The fact that S.A. may not have remembered the date the assault occurred or specific details concerning how Respondent kicked her does not relate so much to her competency to testify, but rather to her credibility as a witness. *State v. Brooks,* 2001 Ohio App. LEXIS 4768, * 8 (2d Dist. Oct. 26, 2001).

{¶ 46} The magistrate conducted an "in-camera" voir dire of S.A. and found her competent to testify. There is nothing in S.A.'s testimony at the hearing to suggest that the magistrate abused her discretion in finding S.A. competent to testify. Upon a thorough review of the record, we do not find that the magistrate erred in denying Respondent's motion to strike S.A.'s testimony. Respondent's second assignment of error is overruled.

## III. Conclusion

{¶ 47} We affirm the judgment of the domestic relations court. We find that the domestic relations court did not abuse its discretion by adopting the magistrate's issuance of the DVCPO because there was sufficient credible evidence in the record to support the DVCPO. We further find that the court did not abuse its discretion in denying Respondent's motion to strike S.A.'s testimony. For the following reasons, we affirm the judgment of the court below.

{¶ 48} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, domestic relations division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MICHELLE J. SHEEHAN, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, J., and
SEAN C. GALLAGHER, J., CONCUR